UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC 2 1 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

LAWRENCE P. FISHER II
3824 Village Park Drive
Chevy Chase, MD 20815,

        Plaintiff,

    v.

GREAT SOCIALIST PEOPLE'S LIBYAN
ARAB JAMAHIRIYA
309-315 East 48th Street
New York, NY 10017

LIBYAN EXTERNAL SECURITY
ORGANIZATION
309-315 East 48th Street
New York, NY 10017

c/o His Excellency Abd al-Rahman Mohamed
Shalgam; Secretary of the General People's
Committee for Foreign Liaison and
International Cooperation; Secretariat of the
General People's Committee for Foreign
Liaison & International Cooperation; Tripoli,
Great Socialist People's Libyan Arab
Jamahiriya;

and

ABDEL BASSET ALI MOHMED AL-
MEGRAHI
*(Last Known Address)*
HM Prison Barlinnie
Lee Avenue, Glasgow, G31
Scotland, UK,

        Defendants.

CASE NUMBER 1:05CV02454

JUDGE: Richard W. Roberts

DECK TYPE: Personal Injury/Malpractic

DATE STAMP: 12/21/2005

## COMPLAINT

Plaintiffs, by their attorney, Law Offices of Paul M. Tendler, as and for their

Complaint, allege as follows:

### INTRODUCTION

1.    Plaintiff Lawrence P. Fisher, II ("Plaintiff") is a brother of the late Charles

T. Fisher, IV who was murdered by Defendants when Pan American World Airways

Flight 103 ("PA 103") exploded over Lockerbie, Scotland, on December 21, 1988.

2.    Plaintiff seeks compensatory and punitive damages for the physical and

emotional injuries inflicted on him by the terroristic actions of the Defendants and the

murder of his brother Charles T. Fisher, IV.

### PARTIES

3.    Plaintiff Lawrence P. Fisher, II was at all times relevant to this complaint,

and continues to be, a citizen of the United States and a resident of the State of Maryland.

Plaintiff is a surviving sibling of Charles T. Fisher, IV.

4.    Defendant Great Socialist People's Libyan Arab Jamahiriya ("Libya") is a

foreign state as defined in 28 U.S.C. § 1603(a). In 1979, the United States Department of

State placed Libya on the State Sponsors of Terrorism List, designating Libya as a

country that repeatedly supports international terrorism. Libya has continually remained

on this list up to and including the filing date of this Complaint.

5.    Defendant Libyan External Security Organization, a/k/a Jamahiriya

Security Organization ("JSO"), is the principal intelligence institution in Libya that has

been responsible for supporting terrorist organizations and for perpetrating state

sponsored acts of terrorism. It is through JSO that Libya has conducted extrajudicial killings, aircraft sabotage, and other acts of terrorism, including the bombing of PA 103.

6.     Defendant Abdel Basset Ali Al-Megrahi, a/k/a Abdelbaset Ali Mohmed, a/k/a AbdelBaset Ali Mohmed Al Megrahi, a/k/a "Mr. Baset," a/k/a Ahmed Khalifa Abdusamad, and a/k/a Abd al-Basit al-Megrahi ("Al-Megrahi") is a citizen of Libya. At all times relevant to this complaint Al-Megrahi was an intelligence agent, official and employee of Libya, the JSO, and the Libyan Arab Airlines ("LAA"). He served as Chief of the Airline Security Section, Operations Division at the LAA, providing physical security for LAA's aircraft and passengers on domestic and international flights. Through this position, Al-Megrahi covertly positioned JSO's operatives as employees of LAA in order to conduct intelligence operations in various countries, including the Republic of Malta.

## JURISDICTION

7.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2), 1350 and 2201 (1993), and 18 U.S.C. § 2333(a) (Supp. 1996).

8.     Libya, the JSO, and Al-Megrahi are subject to suit in the courts of the United States under and in accordance with the provisions of 28 U.S.C. § 1330(b) (Supp. 1996), 28 U.S.C. §§ 1604, 1605(a)(7) and 1605.

9.     Al-Megrahi is also subject to suit in the courts of the United States under and in accordance with the provisions of 18 U.S.C. § 2333(a).

10.     The Court has both subject matter and personal jurisdiction over this action against Defendants, pursuant to 28 U.S.C. §§ 1330(b), 1331, 1332, and 2201 and

the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"). The causes

of action asserted herein against the individual Defendants (a foreign state, an agency or

organ of that state, and an agent of that state) were created by Congress and arise under

the common laws of Plaintiff's home state. Defendants are liable under state common

law principles and common law principles of respondeat superior.

11.    The United States District Court for the District of Columbia is the proper

venue for this action pursuant to 28 U.S.C. § 1391(f).

## **BACKGROUND**

12.    At the time of his death, Charles T. Fisher, IV was a citizen of the United

States and a resident of the State of New York.

13.    Pan American World Airways, an airline corporation registered under 49

U.S.C. § 20, provided commercial passenger air service between the United States and

Europe at all relevant times of this complaint. In December 1988, Pan American World

Airways operated a leased civil aircraft bearing number N739PA. The civil aircraft was

registered with the Federal Aviation Administration pursuant to federal law and operated

within the special aircraft jurisdiction of the United States. On December 21, 1988, Pan

American World Airways designated the civil aircraft bearing number N739PA, traveling

from London to New York as Pan Am Flight 103 ("PA 103").

14.    LAA was, at all times relevant to this complaint and continues to be, an

airline owned by Libya and operated as a commercial enterprise of Libya. LAA actively

and knowingly participated in and was an instrument of its government's terrorist

activities.

15.     Libya and the JSO used LAA to perpetrate and further terrorist acts.  The Airline Security Section of the JSO was responsible for providing physical security for LAA's aircraft and passengers on domestic and international flights, as well as placing covert operatives in various countries masquerading as LAA employees.

## HISTORY OF TERRORISM AGAINST THE UNITED STATES

16.     Defendants' Libya and the JSO have a long history of engaging in and/or supporting terrorist acts.  Beginning in the early 1970s, Libyan leaders publicly announced support for extremist movements and established ties with terrorist organizations around the world.  In large part this was done to advance Libya's political agenda and foreign policies.

17.     Many of the terrorist actions Libya has committed or supported constitute violations of other nations' laws and many international agreements, including, *e.g.*, The Universal Declaration of Human Rights; The International Covenant of Political and Civil Rights, Article 6; The General Assembly Resolutions on Measures to Prevent International Terrorism; and the articles from The Convention on the High Seas.

18.     As part of its policy of using terrorism to meet its political ends, Libya, largely through the JSO, has instigated, organized, participated in and provided material support for acts of sabotage and attacks on civilian aircraft, civilian and military sea vessels, embassies, diplomatic personnel and the murder of civilians in a wide variety of other settings, including synagogues and nightclubs.  Further, Libya ran terrorist training camps, engaged in terrorist activities directly and through proxies, and supported the activities of terrorist organizations throughout the 1980s.

19.     Libya's pro-terrorist policy led the United States to issue a comprehensive

financial and trade embargo against Libya in 1986. Under these sanctions, virtually all
trade between the United States and Libya was prohibited, and all assets owned or
controlled by the Libyan Government in the United States were blocked.

20.    In response to the embargo, Libya implemented another deliberate
campaign of terrorism, specifically against the United States and its allied countries.
Libya struck American targets in Lebanon, Italy and Berlin. The bombing in Berlin
occurred on April 5, 1986, when Libyan agents bombed a Berlin dance club, killing two
American servicemen, a Turkish woman and injuring more than 200 people.

21.    In April 1986, in direct response to Libya's latest terrorist activities, the
United States launched a series of air strikes against Libya and its leader, Muammar
Gaddafi.

22.    Libya again responded with another series of deadly attacks on the United
States and Western interests. As part of its terror campaign, Libya detonated a bomb on
board PA 103 with the purpose of killing innocent American citizens and causing the
attendant emotional distress and suffering to the decedents' families and friends and to
citizens the United States as a whole.

## FACTUAL ALLEGATIONS

23.    The bombing of PA 103 was a terrorist attack on civilians that occurred on
December 21, 1988.

24.    Defendants' actions killed all 259 passengers on board PA 103, including
Charles T. Fisher, IV. An additional 11 deaths resulted when residents of Lockerbie,
Scotland were struck by falling fragments of the airplane.

25.    Defendants' deadly actions were intended to cause fear, pain, and emotional distress to Plaintiff that was immediate, ongoing and permanent.

26.    Defendants, by their actions, intended and knew that the speed of modern communications would allow Plaintiff to virtually witness the destruction at Lockerbie as live coverage and reports would bring him, along with other victims' families and friends, immediately to the scene. Defendants' intended for their actions to cause immediate and severe emotional distress to the victims' family members knowing full well that their actions would shock people around the world, especially these family members.

27.    When Defendants and their officials, agents, employees and operatives began planning an attack against the United States, their designs focused on civilian aircraft. In executing its method and plan, Libyan intelligence used materials it already possessed and materials it would have to acquire through individual and official capacities.

28.    In 1985, a Swiss firm, Meister et Bollier ("MEBO"), at the request and direction of the Libyan government and the JSO, developed specialized timers that were capable of detonating an explosive device at a predetermined time. Twenty of these prototype digital electronic timers, called Model MST-13, were manufactured by MEBO and delivered to the Libyan government ("MST-13 digital timers").

29.    At various times during 1988, the JSO provided Semtex to JSO operatives who engaged in covert terrorist operations outside of Libya. Semtex is a pliable and odorless explosive that contains RDX and PETN and is twice as powerful as TNT and is virtually invisible to conventional security devices.

30.    Sometime in 1988, agents of the JSO stored Semtex in the LAA offices at Luqa Airport, Malta.

31.    Defendant Al-Megrahi, as Chief of the JSO's Airline Security Section, Operations Division, had gained familiarity with the security procedures used by international airlines, so that during the month of December 1988, Al-Megrahi was able to utilize the resources and facilities provided by Libya and LAA to carry out their plot to destroy PA 103.

32.    In preparation for the attack on PA 103, Libyan intelligence gave its operatives, including Defendant Al-Megrahi, the MST-13 digital timers. These timers had single-sided circuit boards, shards of which would later be found in the wreckage of PA 103.

33.    In the days leading up to the bombing of PA 103, Libyan officials and employees and agents of the JSO, including Defendant Al-Megrahi, prepared a bomb using Semtex, a MST-13 digital timer, and electric blasting caps and detonators ("the Semtex Bomb"). They placed the Semtex bomb in the shell of a Toshiba tape recorder.

34.    On or about December 7, 1988, Defendant Al-Megrahi traveled from Libya to Luqa Airport, Malta on a LAA flight. Upon arrival, he registered at the airport Holiday Inn as a "flight dispacher" (sic.) for LAA. Later that day, Defendant Al-Megrahi used Libyan funds to purchase selected items including an umbrella, slacks and pajamas from Mary's House, a retail store located approximately 300 yards from the Holiday Inn.

35.    Defendant Al-Megrahi departed Malta for Zurich, Switzerland, on or about December 9, 1988.

36.     On or about December 17, 1988, Defendant Al-Megrahi returned from Zurich, Switzerland to Luqa Airport, Malta, before continuing to Tripoli, Libya under an assumed name.  On or about December 20, 1988, Defendant Al-Megrahi again returned to Malta, bringing with him a large, brown Samsonite suitcase.  The same type of suitcase was found to have been at the center of the PA 103 explosion.

37.     On or about December 21, 1988, Defendant Al-Megrahi, along with others working with him or on his behalf, while acting within the scope of his authority as an agent and official of the JSO and the Libyan government, set the timer of the Semtex bomb.  Defendant Al-Megrahi, in cooperation with other Libyan agents, placed the shell of the Toshiba tape recorder containing the Semtex bomb into a Samsonite suitcase.  The suitcase was packed with other items ordinarily found in a traveler's suitcase to avoid suspicion.  These items were placed in the suitcase by or at the behest of Defendant Al-Megrahi and were the same items purchased at Mary's House by Al-Megrahi on December 7, 2005.

38.     The Samsonite suitcase containing the Semtex bomb was placed by Defendant AL-Megrahi, or at his instruction, on board Air Malta Flight KM180, which was to leave for Frankfurt, Germany from Luqa Airport, Malta at 9:15 GMT.  The Samsonite suitcase had stolen tags clearing it through to the United States via Frankfurt and London.  Defendants planted the Samsonite suitcase inside the cargo hold as part of the inter-airline baggage, intending for the Samsonite suitcase to be transferred and intentionally placed on board PA 103.

39.     Flight KM-180 arrived at Frankfurt Airport in the early afternoon.  The Samsonite suitcase containing the Semtex bomb was transferred to Pan Am Flight 103-A, a commuter flight headed for London's Heathrow Airport.

40.     Once at Heathrow Airport, Pan Am Flight 103-A's baggage, including the Samsonite suitcase containing the Semtex bomb was transferred to the forward cargo hold of PA 103.

41.     PA 103 was slated to depart London in the afternoon of December 21, 1998 en route to New York with 259 passengers and crew.  In preparation for the bombing of PA 103, Defendant Al-Megrahi and others working for him in their capacities as JSO and Libyan agents had set the timer of the Semtex bomb to explode while PA 103 flew over the Atlantic Ocean.  This was done purposely as Defendant Al-Megrahi and his co-terrorists wanted to hide their association with the plot and its effects, and they knew it would prove extremely difficult, if not impossible, to determine the cause of an explosion while over the ocean.

42.     Charles T. Fisher, IV boarded PA 103 at Heathrow Airport on December 21, 1988, bound for New York.

43.     On December 21, 1988, PA 103 took flight at 18:25 GMT, several hours after its scheduled departure time; thus frustrating Defendants' plan to have PA 103 explode over the Atlantic Ocean.

44.     On December 21, 1988, at or about 19:03 GMT, only 38 minutes after take-off, at an altitude of approximately 31,000 feet, the Semtex bomb exploded in the forward baggage compartment tearing a starburst hole in the skin of the aircraft.

45.    The blast caused the decompression, destruction and disintegration of the aircraft and the deaths of all on board, including Charles T. Fisher, IV. Portions of the aircraft, along with other debris including the passengers themselves, were scattered over an area that exceeded 100 square miles in and around Lockerbie, Scotland. All 243 passengers on board PA 103, its 16-person crew and 11 Lockerbie residents struck by debris were killed. Their deaths occurred as a direct and intentional result of Defendants Al-Megrahi's and JSO's cold, calculated and deliberate actions of placing a bomb set to detonate on flight PA 103.

## ALLEGATIONS OF LASTING EMOTIONAL EFFECTS

46.    Terrorism, by its nature, targets innocent civilians as its victims. Innocent civilians provide targets for the "statements" of retribution and the loss of civilian life becomes the bearer of the terrorists' message.

47.    The very purpose of terrorist activities, such as the bombing of PA 103, is to disrupt and horrify the public and to visit shock, trauma and grief on the relatives and friends of the murdered victims. The more violent, outrageous, heinous and notorious the act, the more harm Defendants are able to inflict.

48.    Images from the explosion and crash of PA 103 were almost immediately broadcast around the world. Television brought Plaintiff, the Fisher family, and the families of the other victims to the scene, essentially as the crash occurred, and provided the Defendants with a vehicle to immediately disperse information around the world. Defendants knew Plaintiff and other members of victims' families, would be exposed to live coverage from the crash site, and they intended for that coverage to cause shock, trauma and grief.

49.    Plaintiff witnessed the immediate devastation, destruction, and chaos resulting from the explosion and crash of PA 103 and the brutal murder of his brother live, in color, and in real time.

50.    Plaintiff was immediately struck and shocked by the graphic violence that brought about the sudden and horrific death of his brother. Plaintiff's exposure to the death and destruction was inescapable and the horror was plain and immediate, as Plaintiff watched instantaneous, live coverage from the scene of the crash on television, heard broadcasts on the radio, and read graphic reports on the front pages of newspapers for weeks.

51.    Plaintiff and his late brother, Charles T. Fisher, IV, shared an extremely close relationship, depending on each other for emotional support, love and help in all aspects of their lives. Thus, the pain and trauma Plaintiff has suffered and endured from the horror of his brother's death was and is severe and lasting.

52.    Defendants' intentions and actions in bombing PA 103 went beyond the ruthless murders of the passengers and crew and were intended to inflict emotional trauma, shock and outrage on the families of the victims through their witnessing the horror of the violent deaths of those on board. Defendants wanted to impose immediate and long-term trauma, emotional pain and suffering upon Plaintiff and all families of those murdered while seeking revenge against the United States.

53.    Defendants succeeded in their goals by causing severe and lasting emotional scars to Plaintiff, and the rest of the Fisher family, when he saw, in real time, the immediate aftermath of the bombing and had to accept the overwhelming evidence that his loving brother Charles T. Fisher, IV was dead, a victim of a violent murder.

54.    In committing the acts of terrorism described herein, Defendant Al-Megrahi and other JSO members who provided material aid in committing the terrorist acts conducted themselves pursuant to the authority granted to them by the JSO. All actions were also conducted within the scope of their duties as agents of the JSO and as agents of Libya.

## THE AFTERMATH AND SUBSEQUENT INVESTIGATION OF THE PA 103 EXPLOSION

55.    After the crash of PA 103, authorities from Scotland, Britain and the United States, with help from other law enforcement agencies worldwide, launched an exhaustive investigation to determine the cause of PA 103's crash and identify those responsible. Tens of thousands of items were recovered, sifted and recorded. Specialists examined any and all items that could provide information on the possible cause of the explosion on PA 103. Relatively early in the investigation, it was uncovered that, as alleged herein, the detonation of a bomb in the cargo hold of PA 103 caused the crash.

56.    On or about November 13, 1991, American and British authorities issued indictments for murder against Al-Megrahi and another Libyan agent ("co-defendant"), alleging that they had caused the explosion on board PA 103. The indictments alleged that the actions of Al-Megrahi and his co-terrorists led to the crash and disintegration of PA 103 and to the deaths of its crew, passengers and the Lockerbie residents killed by falling debris.

57.    The case against Al-Megrahi remained at a stalemate for a number of years as Libya refused to extradite him or his co-defendant for trial. It was not until April 5, 1999, that Libya finally succumbed to substantial international pressure and sanctions and surrendered Al-Megrahi and his co-defendant to the United Nations.

58.     Al-Megrahi and his co-defendant were taken to the Netherlands for prosecution before a Scottish Court of Law.

59.     The trial of Al-Megrahi and his co-defendant began May 3, 2000. Testimony in the trial concluded on January 8, 2001, and closing arguments of counsel concluded on January 18, 2001.

60.     On January 31, 2001, the Court found Al-Megrahi guilty of murder having arranged for the placement and detonation of the Semtex bomb aboard PA 103, killing its crew, passengers and 11 people on the ground in Lockerbie.

61.     The Court found that Al-Megrahi had acted as an agent of Libyan intelligence and in furtherance of the objectives of the JSO.

62.     On March 14, 2002, the Appeals Court, High Court of Justiciary, Scotland, rejected Al-Megrahi's appeal and the Scottish High Court of the Justiciary unanimously affirmed Al-Megrahi's conviction.

63.     Over a period of years, the United Nations and the United States imposed a variety of sanctions on Libya. In order to lift these sanctions, the United Nations Security Counsel and the United States had insisted that the Libyan government admit its guilt in the PA 103 bombing and agree to pay compensation to the family members devastated by the deaths of their loved ones.

64.     On August 15, 2003, Libya acknowledged its responsibility for the acts of its agents, including Al-Megrahi, via letter to the United Nations Security Council. In that letter, Libya agreed to create a compensation fund for some family members of victims on board PA 103. The letter also stated that Libya "accepts responsibility for the actions of its *officials*." (Emphasis added).

65.    Libya's letter to the United Nations Security Council constituted the admission of guilt required to lift United Nations sanctions against Libya. On September 12, 2003, the United Nations Security Council adopted Resolution 1506 formally lifting most United Nations sanctions on Libya.

66.    United Nations Security Council Resolution 1506 notes that the President of the Security Council received a letter from the Charge d'affaires of Libya that recounted Libya's responses to United Nations sanctions and stated that Libya had fulfilled the requirements of United Nations resolutions concerning Libya's "acceptance of responsibility for the actions of Libyan officials." Further, the Security Council press release specifically cites Libya's acceptance of responsibility for the actions of its officials in relation to the explosion on board PA 103 as one of the reasons Resolution 1506 was possible.

67.    On February 26, 2004, the United States lifted its ban on travel to Libya. The travel ban was lifted only after Libya, through its website and its official news agency, affirmed that it "accepts responsibility for the actions of its officials" in the bombing of PA 103. These statements accepting responsibility mirrored the prior statement by Libya's foreign minister Mohammed Abderrahmane Chalgram that "we have taken on the responsibility for this case [PA 103] on the basis of the international law which states that the state takes on responsibility for what its employees do."

## COUNT ONE

### Outrageous Conduct and the Intentional Infliction of Emotional Distress

68.    Each and every preceding paragraph, numbered 1 through 67, is hereby repeated, realleged and incorporated as if fully set forth herein.

69.    The motivation behind Defendants' bombing of PA 103 was to carry out Libyan foreign policy of revenge against the United States and its citizens by killing innocent civilians and causing immediate and long-term shock, emotional trauma and pain to the families of those killed, and horror to the public at large.

70.    Defendants' bombing of PA 103 was an act of terror designed specifically to shock, traumatize, horrify and cause immediate and severe emotional pain and distress to Plaintiff. The destruction of PA 103 resulted in 270 violent and horrific deaths, including the death of Charles T. Fisher, IV. The death and destruction was immediately broadcast to Plaintiff, other members of Charles T. Fisher, IV's family and the world.

71.    The pictures and coverage of the wreckage of PA 103 enabled Plaintiff to witness the explosion of PA 103 and its aftermath almost immediately as it occurred and virtually placed Plaintiff in the presence of the explosion.

72.    Defendants' conduct leading to the death and destruction on board PA 103 and the immediate horror, shock, emotional trauma and suffering inflicted upon the victims' families, including Plaintiff herein, goes so far beyond the bounds of decency as to be regarded as outrageous conduct. Plaintiff's horror, shock, emotional trauma and suffering began with the publicity and media images immediately following the explosion of the Semtex bomb upon PA 103 and it continues to this date. These actions were and are outside the boundaries of actions permissible in a civilized society, as demonstrated by the United Nations resolutions condemning the act, the United Nations imposition of sanctions on Libya and the United States imposition of sanctions on Libya.

73.    As a result of Defendants' intentional and outrageous actions, Plaintiff suffered shock, grief and emotional trauma compensable at common law.

## COUNT TWO

### The Flatow Amendment

74.    Each and every preceding paragraph, numbered 1 through 73, is hereby repeated, realleged and incorporated as if fully set forth herein.

75.    Plaintiff claims an independent federal private right of action directly in favor of each person injured by an act of state sponsored terrorism as provided by 28 U.S.C.§ 1605(a)(7) and the note thereto.  Pursuant to 28 U.S.C. § 1605(a)(7), victims of terrorism can assert a cause of action for monetary damages against agents of a foreign state, acting in their official capacity, if the foreign state employing the agents was, at the time of the action underlying the complaint, on the State Sponsors of Terrorism List. Compensatory damages can be recovered for loss of society of loved ones and for one's emotional suffering by the acts of terrorism.  Punitive damages are also recoverable.

76.    Plaintiff was, at all times relevant to this complaint, and continues to be a citizen of the United States.  At the time of his death, Charles T. Fisher, IV was a citizen of the United States.

77.    At all times relevant to this complaint, Libya was on the Sponsors of Terrorism List as designated by the United States Department of State.

78.    Defendant Al-Megrahi and other co-terrorists aiding in the destruction of PA 103 and the deaths of those on board and on the ground, were at all times relevant to this complaint, agents and/or officials of the Libyan government and the JSO.

79.    In committing the acts of terrorism described herein, these agents acted on behalf of and in the scope of their employment as agents of Libya and the JSO.  In its letter to the United Nations Security Council and elsewhere, Libya has repeatedly

admitted as much by accepting responsibility for the acts of its officials, agents and employees.

80.     Most of the Defendants' acts described herein occurred outside the boundaries of Libya.  These acts include the fashioning of the Semtex bomb, the preparation of the Samsonite suitcase containing the Semtex bomb, the intentional placement of the Semtex bomb onto Air Malta Flight KM180 and the ultimate detonation of the Semtex bomb on board PA 103.

81.     Plaintiff has suffered personal injury through emotional trauma arising out of shock and horror at the violent death of a beloved brother who had provided him with companionship, support and love.

82.     Plaintiff's injuries occurred as a direct result of the deliberate terrorist acts of Defendant Al-Megrahi and other co-terrorists that included: (a) planning for the destruction of PA 103, (b) facilitating, funding and fashioning the Semtex bomb that destroyed PA 103, (c) causing the placement of the Semtex bomb on PA 103, and (d) causing the detonation of the Semtex bomb that destroyed PA 103, killing everyone on board, including Charles T. Fisher, IV.

83.     The Defendants herein caused Plaintiff emotional distress by maliciously, outrageously, and intentionally killing his brother, Charles T. Fisher, IV, as the result of the detonation of the Semtex bomb on board PA 103, a civilian aircraft. Defendants' conduct thus creates liability to Plaintiff as he was clearly injured by an act of state sponsored terrorism.

## COUNT THREE

### The Torture Victim Protection Act

84.     Each and every preceding paragraph, numbered 1 through 83, is hereby repeated, realleged and incorporated as if fully set forth herein.

85.     Defendant Al-Megrahi and other co-terrorists, acting under actual and apparent authority of Libya and the JSO, perpetuated the intentional bombing of PA 103 resulting in the death of 270 people, including Charles T. Fisher, IV, and the immediate emotional trauma to Plaintiff. Defendant Al-Megrahi and other co-terrorists conspired and acted among themselves, as officials of Libya and the JSO and acted within the scope of their agency and authority as Libyan and JSO officials.

86.     The bombing of PA 103 and the resulting deaths of all passengers on board PA 103, including Charles T. Fisher, IV, were extrajudicial killings, not sanctioned by any judgment of any official or legitimate court of law, Libyan or otherwise.

87.     Most of the Defendants acts described herein occurred outside the boundaries of Libya. These acts include the fashioning of the Semtex bomb, the preparation of the Samsonite suitcase containing the Semtex bomb, the intentional placement of the Semtex bomb onto Air Malta Flight KM180 and the ultimate detonation of the Semtex bomb on board PA 103. Thus, the bombing of PA 103 occurred outside of Libyan soil.

88.     Under this statute, no remedies are available to Plaintiffs against Defendant Libya.

89.     Pursuant to 28 USCS § 1350, P.L. 102-256, Defendants are liable to Plaintiff.

## COUNT FOUR

## RESPONDEAT SUPERIOR/GUARANTY

90.    Each and every preceding paragraph, numbered 1 through 89, is hereby repeated, realleged and incorporated as if fully set forth herein.

91.    Under 28 U.S.C. § 1605(a)(7), certain foreign states and their agencies or organs that engage in terrorism are stripped of any form of sovereign immunity to which they might otherwise be entitled in actions for monetary damages arising out of such acts.

92.    The acts for which foreign states do not have immunity include aircraft sabotage and extrajudicial killing, such as the bombing of PA 103.

93.    At all times relevant to this complaint, Libya was on the Sponsors of Terrorism List as designated by the United States Department of State.

94.    Libya has accepted responsibility for the actions of its officials, agents and employees in the bombing of PA 103.

95.    Libya has admitted that it is the principal and employer of Defendant Al-Megrahi and that Defendant Al-Megrahi was Libya's employee and agent.

96.    On or about February 27, 1992, Libya, by letter to then United Nations Secretary-General Boutros Boutros-Ghali, guaranteed payment of any civil judgments that would be entered against Defendant Al-Megrahi for his actions in the bombing of PA 103. This action was taken in an attempt to forestall sanctions and to enhance Libya's stature in the international community. Plaintiff is a third party beneficiary of that guaranty.

97.    In carrying out the destruction of PA 103, Defendant Al-Megrahi and other co-terrorists acted within the scope of their employment as officials, employees and agents of Libya and the JSO. Their actions jointly and severally as tortfeasors led to the death of Charles T. Fisher, IV and the emotional trauma to Plaintiff.

98.    Defendants' actions were directly and immediately the cause of horrifying, shocking, and emotionally traumatizing Plaintiff with the manner and fact of the death of his brother.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

A.    Find Al-Megrahi responsible for the bombing of PA 103, Charles T. Fisher, IV's death, and the horror, shock, emotional trauma, pain and suffering caused to Plaintiff by the horrific and outrageous nature of Defendants' actions;

B.    Find Jamahiriya Security Organization responsible for the bombing of PA 103, Charles T. Fisher, IV's death, and the horror, shock, emotional trauma and suffering caused to Plaintiff by the horrific nature of Defendants' actions as principal to Al-Megrahi;

C.    Find Great Socialist People's Libyan Arab Jamahiriya responsible for the bombing of PA 103, Charles T. Fisher, IV's death, and the horror, shock, emotional trauma and suffering caused to Plaintiff by the horrific nature of Defendants' actions as principal to Al-Megrahi and Jamahiriya Security Organization;

D.    Order Defendants to pay to Plaintiff Lawrence P. Fisher, II compensatory damages, including but not limited to damages for emotional distress, in an amount to be determined at trial;

E.    Order Defendants to pay punitive damages for their intentional, malicious and outrageous conduct in causing the destruction of PA 103, Charles T. Fisher, IV's

death, and the horror, shock and emotional trauma caused to Plaintiff Lawrence P. Fisher,

II through Defendants' outrageous acts, in an amount to be determined at trial;

     F.     Order Libya to pay all or part of any unpaid judgments obtained in this

action against Al-Megrahi;

     G.     Order Libya to pay all or part of any unpaid judgments obtained in this

action against JSO; and

     H.     Grant such other and further additional relief, legal or equitable, as the

Court may deem just and proper, together with attorney's fees, interest, costs and

disbursement of this action.

     Dated: Washington, DC

          December 21, 2005

                          LAW OFFICES OF PAUL M. TENDLER

                          By: *Paul M. Tendler*

                          Paul M. Tendler
                          **LAW OFFICES OF PAUL M. TENDLER**
                          1090 Vermont Avenue, NW
                          Suite 800
                          Washington, DC 20005
                          Tel: (202) 682-9000
                          Fax: (202) 682-0168

                          Timothy D. Battin
                          **STRAUS & BOIES, LLP**
                          4041 University Dr., Fifth Floor
                          Fairfax, Virginia 22030
                          Tel: (703) 764-8700
                          Fax: (703) 764-8704

                          *OF COUNSEL*
                          Michael Straus
                          Mark Schirmer

**STRAUS & BOIES, LLP**
1130 22nd Street South
Birmingham, AL 35205
Tel: (205) 324-3800
Fax: (205) 324-3996