# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CURTIS W. FISHER, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No. 1:04-cv-02055 (HHK)** |
| vs. ) | |
| ) | |
| **GREAT SOCIALIST PEOPLE'S** ) | |
| **LIBYAN ARAB JAMAHIRIYA,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |
| **LAWRENCE P.FISHER II,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No. 1:05-cv-02454 (HHK)** |
| v. ) | |
| ) | |
| **GREAT SOCIALIST PEOPLE'S** ) | |
| **LIBYAN JAMAHIRIYA, et al.,** ) | |
| **Defendants.** ) | |
| _____) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS FILED BY DEFENDANTS THE GREAT SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA AND THE LIBYAN EXTERNAL SECURITY ORGANIZATION AND SUPPLEMENTAL RESPONSE IN OPPOSITION TO <u>DEFENDANT ABDEL BASET ALI AL-MEGRAHI'S MOTION TO DISMISS</u>**

# TABLE OF AUTHORITIES

## U.S. Supreme Court Cases

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989)..............11
*Conley v. Gibson*, 355 U.S. 41 (1957)......................................................10, 11

*U.S. v. Kubrick*, 444 U.S. 118 (1979)..........................................................31

## U.S. Court of Appeals Cases: D.C. Circuit

*Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004)..................................13, 15

*Atchison, Topeka & Santa Fe Ry. Co., v. I.C.C.*, 851 F.2d 1432 (D.C. Cir. 1988).........29

*Cippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2001).................26

*Communications Vending Corporation of Arizona, Inc. v. Federal Communications Commission*, 365 F.3d 1064 (D.C. Cir. 2004)............................................... 31

*Connors v. Hallmark & Son Coal Company*, 935 F.2d 336 (D.C. Cir. 1991)..............29

*Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003)..................................................................................................11

*Kilburn v. Islamic Republic of Iran*, 2006 U.S. App. LEXIS 26051 (D.C. Cir. October 19, 2006)..................................................................................................13

*Nelson v. American National Red Cross*, 26 F.3d 193 (D.C. Cir. 1994). ...................29

*Page v. United States*, 729 F.2d 818 (D.C. Cir. 1984)........................................28

*Phillips v. Heine*, 984 F.2d 489 (D.C. Cir. 1993)..........................................32, 35

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)............11

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ...................................................................................11, 14, 31

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000).........................11

*United States v. Barnes*, 295 F.3d 1354 (D.C. Cir. 2002)...................................31

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)...............................10

*Young v. United States*, 184 F.2d 587 (D.C. Cir. 1950)......................................27

## U.S. Court of Appeals Cases: Other Circuits

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990)............................30

*Gantt v. Security USA, Inc.*, 356 F.3d 547 (4th Cir. 2004)....................................18

*EEOC v. O'Grady,* 857 F.2d 383 (7th Cir. 1988)................................................35

*Ellis v. General Motors Acceptance Corporation*, 160 F.3d 703 (11th Cir. 1998).........31

*Habermehl v. Potter*, 153 F.3d 1137 (10th Cir. 1998)..........................................28

*Kossick v. United States*, 330 F.2d 933 (2d Cir. 1964).........................................28

*Malandris v. Merill, Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152 (10th Cir. 1981)....18

*Maryland ex rel. Burkhardt v. United States*, 165 F.2d 869 (4th Cir. 1947)................28

*Phillips v. Girdich*, 408 F.3d 124 (2d Cir. 2005)...............................................10

*Syms v. Olin Corp.*, 408 F.3d 95 (2d Cir. 2005). ...............................................28

## U.S. District Court Cases: District of Columbia

*Baker v. Great Socialist People's Libyan Arab Jamahiriya*, 2006 U.S. Dist. LEXIS 83095
   (D.D.C. Nov. 7, 2006)...................................................................15

*Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006)...............16, 17

*Burnett v. Al Baraka Investment and Development Corporation*, 274 F. Supp. 2d 86
   (D.D.C. 2003)....................................................................19, 20, 21, 22

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003)...19, 20, 21

*Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230
   (D.D.C. 2005)...........................................................................27, 32

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000)........................11, 31

*Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218 (D.D.C. 2005)............15

*Dammarell v. Islamic Republic of Iran*, 904 F. Supp. 2d 261 (D.D.C. 2005)............21

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998).......................32

*Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90
    (D.D.C. 2006)...................................................................15-17, 19-20, 28

*Hurst v. The Socialist People's Libyan Arab Jamahiriya*, 2007 U.S. Dist. LEXIS 7166
    (D.D.C. Feb. 1, 2007).........................................................15, 16, 23, 26

*Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001)..................19-21

*Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003).......................20-21

*Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168 (D.D.C.
    2005)...........................................................................................15

*Owens v. United States Department of Justice*, 2006 U.S. Dist. LEXIS 87145 (D.D.C.
    Dec. 1, 2006).................................................................................34

*Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003).................32

*Pohill v. Islamic Republic of Iran*, 2001 U.S. Dist. LEXIS 15322
    (D.D.C. Aug. 23, 2001).......................................................................32

*Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120
    (D.D.C. 2005)................................................................................17

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 2006 U.S. Dist. LEXIS 58033
    (D.D.C. May, 11 2006).....................................................................15, 26

*Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53 (D.D.C. 2006).......................21

*Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005)...............20-21

*Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001)........19, 20, 22

*United States v. BCCI Holdings (Lux.), S.A.*, 916 F. Supp.2d 1276, 1284
    (D.D.C. 1996)..............................................................................33, 35

*Vine v. Republic of Iraq*, 459 F.Supp.2d 10 (D.D.C. 2006)...........................3, 28, 29

iv

*Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131 (D.D.C. 2005)...............17, 27, 32

## U.S. District Court Cases: Other Districts

*Cogburn v. U.S.A.*, 717 F. Supp. 958 (D. Mass. 1989)...................................30-31

*Lafferty v. St. Riel*, 397 F. Supp. 2d 602 (E.D. Pa. 2005)......................…...............28

*Posey v. Calvert County Board of Education*, 262 F. Supp. 2d 598, (D. Md. 2003)......18

*Romanski v. Detroit Entertainment, LLC*, 265 F. Supp. 2d 835 (E.D. Mich. 2003)..........…...18

*Rubin v. The Islamic Republic of Iran*, 436 F. Supp. 2d 938 (N.D. Ill. 2006)...............29

## State Cases: District of Columbia

*Hercules & Co. v. Sharma Restaurant Corporation*, 566 A.2d 31 (D.C. 1989)........…..17

## State Cases: Colorado

*CMCB Enterprises, Inc. v. Ferguson*, 114 P.3d 90 (Colo. App. 2005)....................24

*DeStafano v. Grabrian*, 763 P.2d 275 (Colo. 1988)........................................22

*E. B. Roberts Construction Company v. Concrete Contractors, Inc.*, 704 P.2d 859
(Colo. 1985)..............................................................................25

*Highlands Ranch University Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020
(Colo. App. 2005)......................................................................24

*Keller v. Koca*, 111 P.3d 445 (Colo. 2005)...................................................22

*Meiter v. Cavanaugh*, 580 P.2d 399 (Colo. App. 1978)....................…...................18

## State Cases: Maryland

*Anne Arundel County v. Fidelity & Deposit Co.*, 648 A.2d 193 (Md. 1994)...............25

*Harris v. Jones*, 380 A.2d 611 (Md. 1977)..................................................18

*Middlebrook Tech, LLC v. Moore*, 849 A.2d 63 (Md. 2004)................................24

*Oaks v. Connors*, 660 A.2d 423 (Maryland App. 1995).....................................22

*Walton v. Washington County Hospital Association*, 13 A.2d 627 (Md. 1940)..............24

## State Cases: Massachusetts

*Agis v. Howard Johnson Company*, 355 N.E.2d 315 (Mass. 1976)..............................18

*Dias v. Brigham Medical Associates, Inc.*, 780 N.E.2d 447 (Mass. 2002)..................22

*D'Annolfo v. D'Annolfo Construction Company, Inc.*, 654 N.E.2d 82
    (Mass. App. 1995) ...........................................................................24

*Elms v. Osgood*, 1998 Mass. Super. LEXIS 131 (Mass. Sup. May 13, 1998)..............24

*Flattery v. Gregory*, 489 N.E.2d 1257 (Mass. 1986)...........................................25

## State Cases: Michigan

*Champion v. Nationwide Sec. Inc.*, 545 N.W.2d 596 (Mich. 1996)..........................18

*Doe v. Mills*, 536 N.W.2d 824 (Mich. App. 1995)...........................................25

*Hammack v. Lutheran Social Services of Michigan*, 535 N.W.2d 215
    (Mich. App. 1995)...........................................................................25

*Haverbush v. Powelson*, 551 N.W.2d 206 (Mich. App. 1996)..............................18

*Williams v. R. Thomas Construction Co.*, 2006 Mich. App. LEXIS 572
    (Mich. App. Mar. 2, 2006)..................................................................25

## Statutes & Rules

Torture Victim Protection Act, 28 U.S.C. § 1350.....................................1, 14, 28

Foreign Sovereign Immunities Act 28 U.S.C. § 1601, et. seq...2, 4, 12-15, 25, 27, 29, 31-
................................................................................................................32, 35

Fed. R. Civ. P. 4.................................................................................18

Mich. C.L.S. § 600.1405.........................................................................25

## **Treatises and Restatements**

Restatement (Second) of Contracts.............................................................24

Restatement (Second) of the Law of Torts....................................................18

Restatement (Second) of Agency.............................................................…....23

# TABLE OF CONTENTS

Overview………………………………………………………………………….Page 1

Facts………………………………………………………………………………Page 4

Legal Argument…………………………………………………………………..Page 10

    I. The Court Has Jurisdiction to Hear The Claims In This Action………......Page 11

    II. The Amended Complaint States Claims Against Libya………………...Page 14

        The Causes of Action Are Stated With Necessary Specificity…….Page 15

        The Complaint States Claims for International Infliction of Emotional
        Distress…………………………………………………………..Page 16

        The Complaint States Claims Against Libya Based on Contractual
        Principles………………………………………………………...Page 23

    III. The Claims In The Amended Complaint Were Timely Filed………….Page 26

Conclusion………………………………………………………………………….Page 35

Plaintiffs Curtis W. Fisher, Lawrence P. Fisher, Mary Fisher Hickey and Margaret

Fisher Jones (the "Fishers"), by and through their counsel, respectfully submit this

memorandum in opposition to the motions to dismiss filed by Defendants Great Socialist

People's Libyan Arab Jamahiriya and the Libyan External Security Organization (the

"Libya Motion") (together hereafter referred to as "Libya"),[1] and as a supplement to the

papers in previously filed opposition to Abdel Basset Ali Al-Megrahi's ("Al-Megrahi")

motion to dismiss the claims asserted against him (the "Al-Megrahi Motion").[2]

## OVERVIEW

The Fishers seek to recover damages for the severe and long-lasting mental

anguish and suffering caused to them by the Defendants' murder of their brother in the

terrorist bombing of Pan American World Airways Flight 103 ("PA 103"), which

exploded over Lockerbie, Scotland, on December 21, 1988.  To this end, the Fishers

assert causes of action against the Defendants under a variety of theories, including

causes of action under common law of Colorado, Maryland, Massachusetts and Michigan

and statutory causes of action pursuant to the federal Torture Victim Protection Act, 28

U.S.C. § 1350, P.L. 102-256 (the "TVPA") and pursuant to the "Flatow Amendment," a

federal cause of action available against individual state agents for harm caused by acts of

---

[1] By order dated February 16, 2007, Civil Action No. 1:04-cv-02055 (HHK) was consolidated for pretrial purposes with Civil Action 1:05-cv-02454 (HHK), and all papers are ordered to be filed in 04-cv-02055. Because the arguments in the motions to dismiss in both cases were essentially identical, as were the operative allegations of the Complaints, the Fishers are filing a single, consolidated brief in response to the motions to dismiss in both cases.  For the convenience of the Court, because the complaints in these two actions are substantively the same (with some changing of numbering), with one exception, references to allegations of the complaints are identified by their location in the Amended Complaint in 04-cv-02055 (the "Amended Complaint").  For the convenience of the Court, should it desire to check each factual citation against each complaint, a grid identifying the comparable paragraphs in the complaint in 05-cv-02454 is attached hereto as Exhibit A.

[2] Libya and Al-Megrahi will be referred to collectively as "Defendants."

1

terrorism, published as a note to 28 U.S.C. § 1605, a subsection of the Foreign Sovereign

Immunities Act ("FSIA"), which defines the scope of immunity for foreign governments

in actions in U.S. courts. *See* 28 U.S.C. § 1601, et. seq.

The Fishers may pursue these causes of action against Defendants because FSIA

strips foreign governments and their agents of immunity from suit if the relevant foreign

government in some way aids terrorist activities and, at the time it provides such aid, the

relevant foreign government was officially identified by the State Department as a state

sponsor of terrorism. During the period of the acts at issue – and until June of 2006, well

after this suit was filed – Libya was designated as a state sponsor of terror. Thus, Libya's

actions, and the actions of its agent Al-Megrahi in the bombing of PA 103, fall squarely

within the waiver of immunity for terrorist actions under FSIA. Further, because the

Court has subject matter jurisdiction over Libya, it also has personal jurisdiction over

Libya pursuant to FSIA.

The Fishers assert common law claims for intentional infliction of emotional

distress and guarantee/respondeat superior (really the common law of agency and

contract) under the common law of their respective home states: Colorado, Maryland,

Massachusetts and Michigan. The allegations in the Fishers' complaints provides the

necessary precision to put the Defendants on notice of exactly what they will be

defending against. The facts of the relevant incidents are outlined, the Fishers' home

states are identified and the fact that these causes of action are common law causes of

action is made clear in the Amended Complaint. Further, the general common law causes

of action – which can only arise under state law – are set out separately from the causes

of action based upon federal statutory law.

2

Libya's liability is straightforward. Al-Megrahi was Libya's agent and was acting in furtherance of Libyan policy. The bombing of PA 103 was an extreme, outrageous act that was intended to and did cause the Fishers severe emotional trauma. As members of Charles Fisher's immediate family who were intended targets of Defendants' actions and were "virtually" present at the crash of PA 103 through the intense and immediate coverage it received in the international media, the Fishers have the right to recover against Defendants for the intentional infliction of emotional distress.

Similarly, Libya's liability for Al-Megrahi's acts and any damages he caused arise under state common law. Al-Megrahi himself is liable to the Fishers under the Flatow Amendment. Libya, which guaranteed to compensate those harmed by its agents acts and which has accepted its responsibility for its agents' acts[3] is thus liable under normal contractual principles: Libya made a promise to compensate people like the Fishers and to guarantee or pay claims against its agents. Thus, Libya has made a promise to people in a similar position as the Fishers, received consideration for that promise, and now the Fishers seek to enforce that promise.

Finally, Al-Megrahi raised a number of new arguments in his reply papers that the Court granted the Fishers leave to address here.[4] Most notably, Al-Megrahi argued that this action is time barred under the analysis of *Vine v. Republic of Iraq*, 459 F.Supp. 2d 10 (D.D.C. 2006). Under the circumstances, this argument is misplaced. First, Al-Megrahi did not explain how or why the analysis in *Vine* applies to this case – as he is required to do in support of his statute of limitations affirmative defense. Second, Al-

---

[3] Libya accepted responsibility in order to gain favor with the United States in order to have the sanctions imposed against it lifted.

[4] Plaintiffs were granted leave to file a supplemental response by the Court in its Order dated February 1, 2007.

3

Megrahi's argument did not address the question of when the causes of action in this case accrued. In general, causes of action do not accrue until a plaintiff learns of his or her injury and that some wrongdoing by a defendant caused the injury – i.e., he learns facts that would lead him to believe he has a cause of action against a defendant.

In this case, the causes of action could not have "accrued" until 1996 at the earliest, when Congress abrogated Libya's immunity and created the Flatow Amendment cause of action. Even if Plaintiffs knew of their injury and knew who had caused it (which they could not, because much of the evidence was secret and still part of law enforcement files), plaintiffs *knew* they did *not* have a cause of action. It is wholly unclear how a cause of action under the Flatow Amendment could *accrue* before it *existed*. Further, the difficulties in actually determining whether Libya was behind the bombing of PA 103 should serve to toll the statute of limitations until 1999 or 2000, which is when the trial against Al-Megrahi began, as evidence was kept secret until trial to protect sources, information gained by law enforcement in their investigation was still not public, and Libya continued to deny its role in the bombing and was preventing an airing of the evidence against it by failing to extradite Al-Megrahi. Finally, the structure of 28 U.S.C. § 1605(f) mandates that the cause of action run no sooner than 2006, especially in light of its mandate that all normal equitable tolling principles as well as the time that the sovereign was immune should apply to toll the running of the statute of limitations.

## FACTS

This case arises out of the actions of the Defendants' intentional and deliberate terrorist bombing of an intercontinental flight, PA 103, which caused PA 103 to explode

over Lockerbie, Scotland, on December 21, 1988, murdering Charles T. Fisher, IV

("Charles Fisher") – the Fishers' brother – as well as all others aboard the flight and 11

people on the ground in Lockerbie. (E.g., Amended Complaint, ¶¶ 1, 25-28, 47.)

**The Parties to This Action**

The plaintiffs are the Fishers, two brothers and two sisters of Charles Fisher, who

was murdered by the Defendants' actions in bombing PA 103. (Amended Complaint, ¶

1.) Curtis W. Fisher, one of the late Charles Fisher's brothers and a U.S. citizen, resided

in Michigan at all times relevant to this action. (Amended Complaint, ¶ 3.) Mary Fisher

Hickey, one of Charles Fisher's sisters and a U.S. citizen, resided in Colorado at all times

relevant to this action. (Amended Complaint, ¶ 4.) Margaret Fisher Jones, another of

Charles Fisher's sisters and a U.S. citizen, resided in Massachusetts at all times relevant

to this action. (Amended Complaint, ¶ 5.) Lawrence P. Fisher, one of Charles Fisher's

brothers and a U.S. citizen, resided in Maryland at all times relevant to this action.[5]

The Defendants in this action are Libya, a foreign state (Amended Complaint, ¶

6), and its intelligence service, the Jamahiriya Security Organization, through which is

conducted terrorist acts, including the bombing of PA 103. (Amended Complaint, ¶ 7.)

The Amended Complaint also names as a Defendant Al-Megrahi, an individual who is

alleged to have been a Libyan intelligence agent and an official and employee of Libya,

its intelligence service and its state airline. (Amended Complaint, ¶¶ 8, 33, 35, 56, 63,

66.)

---

[5] Lawrence Fisher Complaint in 05-cv-02454 at ¶ 3.

**Libya's Support of Terrorism**

In 1979, the United States Department of State placed Libya on the Department's list designating state sponsors of terrorism, a designation that persisted until June 30, 2006. (*See* Amended Complaint, ¶ 6.)[6] As could be expected given the long-standing designation of Libya as a state sponsor of terrorism, Libya had a long history of both supporting terrorism and engaging in terrorist acts through its agents. (Amended Complaint, ¶¶ 18-24.) Largely through the JSO, Libya instigated, organized, participated in and provided material support for acts of sabotage and other attacks on civilian aircraft, and attacks on embassies and diplomatic personnel. Libya and JSO (directly and through proxies) planned and carried out attacks against civilian and military vessels on the seas, murdered civilians in a wide variety of settings, including synagogues and nightclubs and funded and ran training camps for terrorists. (Amended Complaint, ¶¶ 20, 22, 24-26.) In 1986, in addition to keeping Libya on the list of state sponsors of terrorism, the United States broke off diplomatic and economic ties with Libya and froze Libyan assets in the United States. (Amended Complaint, ¶ 21.)

**The Defendants Bomb PA 103**

In March of 1986, Libya responded to the U.S. imposed economic sanctions by bombing a Berlin dance club and causing or instigating attacks on American targets in Lebanon and Italy. (Amended Complaint, ¶ 22.) These strikes by Libya led to air strikes by the United States aimed at Libya and its leader, Moammar Gadhafi. (Amended Complaint, ¶ 23.) In response to the U.S. air strikes in April of 1986, Libya planned and

---

[6] The Fishers understand that Libya was removed from the list of state sponsors of terrorism in June 2006, after the Amended Complaint had been filed and served. For purposes of this response to Al-Megrahi's motion, Plaintiffs assume that to be true.

engaged in a number of terrorist activities, including the bombing of PA 103. (Amended Complaint, ¶ 24.)

In 1985, the Libyan government and its intelligence agency, the Jamahiriya Security Organization ("JSO"), contracted a Swiss firm to develop specialized timers capable of detonating an explosive device at predetermined times. (Amended Complaint, ¶ 30.) These timers, along with Semtex, a pliable and odorless explosive that is twice as powerful as TNT and virtually invisible to conventional security devices, were distributed by the JSO throughout 1988 to its operatives including Defendant Al-Megrahi. (Amended Complaint, ¶¶ 31-32, 34 .) Together, along with electronic blasting caps and detonators, Libyan and JSO agents, including Defendant Al-Megrahi, created the bomb (the "Semtex Bomb") that eventually destroyed Pan Am 103 killing Plaintiffs' brother, Charles T. Fisher, IV. (Amended Complaint, ¶¶ 35, 39-40.)

Defendant Al-Megrahi, along with others working with him or on his behalf, took the Semtex Bomb and placed it in the shell of a tape recorder. (Amended Complaint, ¶ 35.) After purchasing and packing items traditionally found in luggage, they placed the tape recorder in a Samsonite suitcase and loaded it onto a flight leaving from Malta to Germany. (Amended Complaint, ¶ 40.) In Germany, the suitcase, using stolen tags, was placed on flight 103 bound for London and then New York. (Amended Complaint, ¶¶ 38-42.) In all his actions in connection with the bombing of PA 103, Al-Megrahi (and others who worked with him) acted with the aid and pursuant to the authority provided to him as an agent of the JSO and Libya. (Amended Complaint, ¶¶ 34-35, 56, 63, 66.)

It was at Heathrow Airport in London, on December 21, 1988, that Charles T. Fisher, IV boarded the ill-fated Pan Am 103. (Amended Complaint, ¶ 44.) The Semtex

7

Bomb in the Samsonite suitcase was already aboard and timed by Defendants to explode over the Atlantic Ocean in an intentional attempt to hide any evidence or trace of Libyan involvement. (Amended Complaint, ¶ 43.) Due to delays at the airport, however, the flight was delayed several hours causing the bomb, and consequently the plane, to explode while the aircraft was over Lockerbie, Scotland. (Amended Complaint, ¶¶ 45, 46.) All aboard, including Plaintiffs brother Charles T. Fisher IV, and 11 innocent persons on the ground perished. (Amended Complaint, ¶ 47.)

The Defendants' purpose in bombing PA 103 was to kill Americans and, as with all acts of terrorism (but specifically this one), to cause severe emotional distress and suffering – shock, trauma, horror and grief – to the families of those killed. (Amended Complaint, ¶¶ 24, 28, 48-50, 54-55.) Terrorism, by its nature, targets innocent civilians as its victims as "statements" of retribution and bearers of the terrorists' message to the families of those killed. (Amended Complaint, ¶¶ 48-49.)

The Fishers, as witnesses of the tragedy and the heinous death of their brother, were thus the intended and ultimate victims of the Defendants' actions. (Amended Complaint, ¶¶ 49-54.) Defendants knew Plaintiffs and other members of victims' families, would be exposed to instantaneous coverage of this horrific event, including live coverage from the crash site, and they intended for that coverage to cause shock, trauma and grief. (Amended Complaint, ¶¶ 50, 54.)

The Defendants' actions had the desired effect. (Amended Complaint, ¶¶ 51-53, 55.) Images of the effects of the explosion and crash of PA 103 were almost immediately spread around the world. (Amended Complaint, ¶ 50.) Television brought the Fishers to the scene as it happened. (Amended Complaint, ¶ 51.) They saw the fires and the effects

of the explosion and crash of PA 103 – with the immediate impact of the graphic horror of the violence and manner of the death of their brother – live, in color, and in real time. (Amended Complaint, ¶ 52.) They repeatedly saw the death of their brother and the scene of destruction live on TV, heard about it on the radio and read about it in the next morning's papers. (Amended Complaint, ¶¶ 51, 55.)

The Fishers and their brother had been close, helping each other and providing and emotionally supporting one another in tough times. (Amended Complaint, ¶ 53.) The result of Defendants' terrorism was predictable and Defendants accomplished what they had intended: horror, shock, grief and severe and lasting emotional scars among the Fishers, their family and the families on board PA 103. (Amended Complaint, ¶¶ 52, 55.)

**The Defendants Are Caught**

After the crash of PA 103, Scottish, British and U.S. authorities, with help from other law enforcement agencies worldwide, launched an exhaustive investigation to determine the cause of PA 103's crash and to identify those responsible. (Amended Complaint, ¶ 57.) This process, which began almost immediately, took several years before indictments could even be issued preliminarily identifying Libyan nationals as among those responsible. (Amended Complaint, ¶¶ 57-58.) The case could not proceed – and relevant evidence could not be released from its secret or confidential law enforcement files – for many years, as Libya and Al-Megrahi delayed the trial by refusing extradition of Al-Megrahi and another Libyan national named in the indictment.[7] (See Amended Complaint, ¶¶ 59-64.) On January 31, 2001, Al-Megrahi was found guilty of murder for arranging for the placement and detonation of a bomb on PA 103 and the court determined that Al-Megrahi acted as a Libyan agent in furtherance of Libyan goals

---

[7] The other Libyan national was ultimately acquitted.

in causing the bombing of PA 103. (Amended Complaint, ¶ 62.) On March 14, 2002, Al-Megrahi's direct appeals of his conviction were denied and his conviction was affirmed. (Amended Complaint, ¶ 64.)

While starting in the early to mid-1990s, Libya conditionally agreed to compensate those harmed by the actions of Libyan agents in the downing of Pan Am 103. Although Libya continued to deny responsibility for the bombing, it ultimately and unconditionally agreed to accept responsibility (and pay compensation) for the acts of its agents. Finally, after Libya agreed that it would accept such responsibility in 2003 and 2004 (Amended Complaint, ¶¶ 65-69), sanctions against Libya began being lifted and, in the summer of 2006, the United States and Libya resumed diplomatic relations with Libya being removed from the U.S. State Department's list of state sponsors of terrorism.

## LEGAL ARGUMENT

General Principles

A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief under any realistic legal theory. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005) ("All complaints must be read liberally; dismissal on the pleadings never is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory."). In addition, where, as here, the question of subject matter jurisdiction is before the Court on a motion to dismiss on the pleadings, a court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that

would entitle him to relief. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36,

40 (D.C. Cir. 2000); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 42-43 (D.D.C.

2000) (citations omitted). If the allegations show that the defendants are not immune

from suit, it is they who bear the burden of proving that the allegations do not bring the

case within one of the statutory exceptions to immunity. *Phoenix Consulting, Inc. v.*

*Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). In examining whether the

allegations of these complaints are sufficient, the Court must treat the Fishers' factual

allegations as true and draw all reasonable inferences in favor of the validity of their

claims. *See Conley*, 355 U.S. at 45-46, *Holy Land Foundation for Relief and*

*Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Sparrow v. United Air*

*Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).[8]

## I.     THE COURT HAS JURISDICTION TO HEAR THE CLAIMS IN THIS ACTION.

FSIA provides the basis for the exercise of jurisdiction over a foreign state in this

Court. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433-434

(1989). Under FSIA, subject matter jurisdiction and personal jurisdiction over a

sovereign defendant are established by (1) proper service of the foreign state and (2)

satisfaction of one of the statutory exceptions to sovereign immunity. *Price v. Socialist*

*People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002) ("*Price*"). Pursuant

to section 1605 of FSIA, sovereigns lack immunity in cases

> "in which money damages are sought against a foreign state for personal injury
> or death that was caused by an act of torture, extrajudicial killing, aircraft

---

[8] In evaluating the motions to dismiss, the Court may consider those facts "alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Hurst v. The Socialist People's Libyan Arab Jamahiriya*, 2007 U.S. Dist. LEXIS 7166 at *8 n.6 (D.D.C. Feb. 1, 2007) (citations omitted) ("*Hurst*").

sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency..."

28 U.S.C. § 1605(a)(7).

At the time the acts outlined in these complaints occurred, the United States Department of State listed Libya as a state sponsor of terrorism and the allegations against Libya and Al-Megrahi outline the terroristic actions that harmed the Fishers. These allegations make out a prima facie case for holding that Libya has no claim of sovereign immunity here.

Libya, however, claims that because the State Department removed it from the list of nations that sponsor terrorism in the summer of 2006, this Court no longer has jurisdiction over the claims in the Amended Complaint under 28 U.S.C. § 1605(a)(7). Libya's argument ignores both the statutory language and the relevant case law – both of which are contrary to Libya's position.

Libya's claim that being removed from the U.S. State Department's list of state sponsors of terrorism in 2006 negates the applicability of the provision stripping it of its sovereign immunity for actions that occurred while it was actively listed as a state sponsor of terrorism is contrary to the express language of the relevant FSIA provisions. The language of 28 U.S.C. § 1605(a)(7) is clear: the state may claim that the provision stripping it of its sovereign immunity for supporting terrorism only if "the foreign state was not designated as a state sponsor of terrorism ... *at the time the act occurred...*" 28 U.S.C. § 1605(a)(7) (emphasis added). Libya was so designated at all times the relevant acts occurred and thus the State Department's subsequent removal of Libya from the list of state sponsors of terror is not relevant.

12

Further, courts in this Circuit have uniformly rejected the position Libya forwards here, holding that a court has jurisdiction to hear claims against sovereigns and their agents based on terrorist acts if the State Department listed the sovereign as a state sponsor of terror at the time the acts underlying the complaint occurred. In *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 1010 (2005), the Court of Appeals for this Circuit concluded that "FSIA specifically provides that when a country, once designated as a state sponsor of terrorism, is subsequently restored to good standing, that country is still amenable to suit for acts that took place prior to the restoration of its sovereign immunity." *Id.* at 56. The Court of Appeals recently summarily dismissed an appeal by *Libya* based upon the argument *Libya* is currently trying to endorse, stating the following:

> ORDERED that the motion for summary affirmance be granted. The merits of the parties' positions are so clear as to warrant summary action. The district court properly denied the motion to dismiss for lack of subject-matter jurisdiction. Because *Libya* was designated as a state sponsor of terrorism at the time the alleged acts occurred, it is not entitled to sovereign immunity, even though it was later removed from the list of state sponsors of terrorism.

*Kilburn v. Islamic Republic of Iran*, 2006 U.S. App. LEXIS 26051 at *1-2 (D.C. Cir. Oct. 19, 2006) (emphasis added; citations omitted) (copy attached hereto as Exhibit B). Similarly, this Court, in *Vine v. Republic of Iraq*, 459 F.Supp. 2d 10 (D.D.C. 2006), held that:

> Congress explicitly gave the courts jurisdiction over claims where the defendant, a foreign sovereign, was designated as a state sponsor of terrorism 'at the time the act occurred.' 28 U.S.C. § 1605(a)(7)(A). By focusing on the foreign sovereign's designation at the time the act occurred, as opposed to when the suit is pending, *Congress chose to allow a plaintiff to pursue claims against even those foreign nations whose sponsorship of terrorism ceases.*

*Id.* at 21 (emphasis added; citations omitted).

Libya does not – because it cannot – provide any other reason that this Court lacks subject matter jurisdiction over this action. Pursuant to 28 U.S.C. § 1605(a)(7), this Court has subject matter jurisdiction to hear this case.

Further, because this Court has subject matter jurisdiction over this matter and because Libya does not deny that it was properly served pursuant to 28 U.S.C. § 1608, this Court has personal jurisdiction over Libya. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d at 89. Libya admits that *Price* controls the issue and asserts that the Court lacks personal jurisdiction only to preserve the argument for appeal.

## II.     THE AMENDED COMPLAINT STATES CLAIMS AGAINST LIBYA

The Fishers seek to pursue causes of action under state common law theories of intentional infliction of emotional distress (and through normal agency principles or respondeat superior against Libya) and based upon Libya's guarantee and agreement to accept responsibility for the actions of its agents. This guarantee and acceptance of responsibility provides the basis for holding it liable for *any* damages caused by Al-Megrahi and for which he can be held liable under the Flatow Amendment and the TVPA.

By and large, Libya does not take issue with the above analysis. Libya argues instead that these cases should be dismissed because the complaints fail to specifically set forth a choice of law analysis and identify the law of each state that forms a basis for the Fisher's claims. Libya also argues that the Flatow Amendment and the TVPA do not create direct causes of action against it. Libya's arguments, however, rest upon a

14

misunderstanding of the nature of the claims asserted by the Fishers and the legal requirements for setting forth such claims.

## The Causes of Action Are Stated With Necessary Specificity

Libya argues that the claims against it must be dismissed because the state law on which the claims are based is not pleaded with the necessary specificity – *i.e.*, the specific states' laws on which the claims rest are not specifically pled. This argument lacks merit. The pleading standards applicable to FSIA claims do not require that the Fishers set forth "their *choice of law* contentions in their complaint[s]." *Hurst*, 2007 U.S. Dist. LEXIS 7166 at *16-17 (emphasis in original, citations omitted). Notice pleading rules apply to the claims asserted against Libya, and for that reason, the Fishers need not plead the specific state law or all the theories that support their causes of action. *See id.* at *17-18; *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, 2006 U.S. Dist. LEXIS 83095 (D.D.C. Nov. 7, 2006) (plaintiffs are not required to plead legal theories or identify specific choice of law in a complaint under the cases brought pursuant to the immunity waiver of 28 U.S.C. § 1605(a)(7)); *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 182-83 (D.D.C. 2005); *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 95 (D.D.C. 2006); *but see Pugh v. Socialist People's Libyan Arab Jamahiriya*, 2006 U.S. Dist. LEXIS 58033 (D.D.C. May, 11 2006) (finding *Acree* required pleading legal theories with specificity).[9]

---

[9] As in cases such as this, there is no federal common law and thus when the complaints identify common law causes of action that does and must refer to the common law of the relevant states. To the extent that the complaints need to specify specific states as the source for the common law claims in the sections addressing the specific claims, the Fishers should be allowed to amend their complaint to so specify the laws of the states noted herein, especially since this Court's decision in *Pugh* was not issued until after the case had been filed and the statute of limitations had run. *See Pugh v. Socialist People's Libyan Arab Jamahiriya,* 2006 U.S. Dist. LEXIS 58033 at *52-54 (D.D.C. May 11, 2006) (ordering amendment of the complaint); *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d at 182-83; *Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218, 222-23 (D.D.C. 2005).

The complaints extensively detail the relevant events, the location of the relevant events, the residences of the parties at the relevant times, and the common law causes of action under which the Fishers will seek relief. These " allegations constitute the 'short and plain statement' required by the federal rules, and no further notice is required." *Hurst*, 2007 U.S. Dist. LEXIS 7166 at \*18-19. Put simply, the causes of action for intentional infliction of emotional distress under state common law. (*See* Amended Complaint, ¶ 75.) Similarly, Libya's liability to pay damages caused by Al-Megrahi (whether those damages are assessed under state law or federal law) arises because of its contractual guarantee of payment – a state law cause of action, based upon normal state common law contractual principles.

The Complaint States Claims for Intentional Infliction of Emotional Distress

Plaintiffs seek damages under the laws of the United States, specifically pursuant to the common law of their home states of Colorado, Maryland, Massachusetts and Michigan for the intentional infliction of emotional distress. The law of the states in which the Fishers lived at the time of the attack should apply when examining the state law causes of action under applicable choice of law principles.

As the court in *Greenbaum v. Islamic Republic of Iran* noted, "the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the United States has a 'unique interest' in having its domestic law apply in cases involving terrorist attacks on United States citizens." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 101-102 (D.D.C. 2006); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006) (same).

16

In determining what state law to apply under choice of law principles, this Court looks to the law of the forum (i.e. Colorado, Maryland, Massachusetts and Michigan) to determine which states' laws shall apply. *Greenbaum,* 451 F. Supp. 2d at 102; *Bodoff,* 424 F. Supp. 2d at 83; *see Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 132 (D.D.C. 2005). The *Greenbaum* court stated that "under District of Columbia choice of law rules, courts employ a refined government interest analysis under which they 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Greenbaum,* 451 F. Supp. 2d at 102 (citing *Hercules & Co. v. Sharma Restaurant Corporation*, 566 A.2d 31, 41 (D.C. 1989)); *Bodoff,* 424 F. Supp. 2d at 83; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d at 132. Application of this test to the issues of state law in this case should lead the Court to apply the law of the Fishers' residences, as those are the states with the greatest interest in providing redress to their citizens. *Greenbaum,* 451 F. Supp. 2d at 102 (applying the laws of the domiciles of the plaintiffs to claims for intentional infliction of emotional distress); *Bodoff*, 424 F. Supp. 2d at 83 (same); *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 140-41 (D.D.C. 2005) (same); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d at 132-33 (same).

The common law in each of the relevant states regarding intentional infliction of emotional distress follows the contours of the cause of action set out in Restatement

(Second) of the Law of Torts, § 46 ("the Restatement").[10]  The text of the Restatement on

Infliction of Emotional Distress reads as follows:

> § 46.  Outrageous Conduct Causing Emotional Distress
>
> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> (b) to any other person who is present at the time, if such distress results in bodily harm.

The elements of such a cause of action are:  (1) conduct that is extreme and

outrageous; (2) conduct that was intentional or reckless; (3) conduct that causes

emotional injury or distress; and (4) severe emotional distress. *Malandris v. Merill,*

*Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, 1158-59 (10th Cir. 1981) (interpreting

Restatement and Colorado law); *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *Gantt v.*

*Security USA, Inc.*, 356 F.3d 547, 553 (4th Cir. 2004); *Posey v. Calvert County Board of*

*Education*, 262 F. Supp. 2d 598, 601 (D. Md. 2003) (interpreting Maryland law); *Agis v.*

*Howard Johnson Company*, 355 N.E.2d 315, 318-19 (Mass. 1976); *Haverbush v.*

*Powelson*, 551 N.W.2d 206, 209 (Mich. App. 1996); *Doe v. Mills*, 536 N.W.2d 824, 833

(Mich. App. 1995).

---

[10] *Meiter v. Cavanaugh*, 580 P.2d 399, 400-401 (Colo. App. 1978); *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *Agis v. Howard Johnson Company*, 355 N.E.2d 315, 317-18 (Mass. 1976) While the Michigan Supreme Court has not yet recognized a cause of action for intentional infliction of emotional distress, lower appellate courts in Michigan have held such a cause of action exists in Michigan and federal courts have assumed that Michigan has such a cause of action under the guidelines of the Restatement. *See Romanski v. Detroit Entertainment, LLC*, 265 F. Supp. 2d 835, 848 fn. 8. (E.D. Mich. 2003).

Terrorist acts, such as the bombing of PA 103, fit squarely within the contours of the cause of action for emotional distress on the laws of the relevant states. For a cause of action for emotional distress, acts of terrorism like the one at issue here, by definition, constitute outrageous and barbarous conduct. *Greenbaum*, 451 F. Supp. 2d at 104; *Burnett v. Al Baraka Investment and Development Corporation*, 274 F. Supp. 2d 86, 107-108 (D.D.C. 2003) (September 11 attacks appear to be "a perfect fit for the elements of intentional infliction of emotional distress"); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) (hostage taking by terrorist group "easily qualifies as extreme and outrageous"); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 49-50 (D.D.C. 2001) ("The conduct of Hiszbollah, in taking someone hostage for over six years, is well neigh extreme and outrageous); *see also Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 271 (D.D.C. 2003) (Iran as state sponsor of Hamas bombing of a pedestrian mall in Jerusalem was held liable for intentional infliction of emotional distress).

The bombing of PA 103 and the creation of the Fishers emotional trauma was an intentional infliction of emotional distress. As the Fishers allege, the bombing of PA 103 was designed to cause the families of those killed or hurt emotional trauma. Further, placing a bomb on a plane with the intent that the plane explode, to kill all aboard, and to cause emotional distress is clearly intentional conduct. *Greenbaum*, 451 F. Supp. 2d at 104 ("Terrorist acts, by their nature, are intentionally designed to inflict harm, and thereby to cause severe emotional distress. (*See* Dr. Clawson Dep. (Ex. 14) at 28 ('[T]he Iranian Government has no doubt that many of those killed are, in fact, children and other civilians and that the relatives and friends of those killed ...suffer psychological damage

19

as a result.'").); *Burnett*, 274 F. Supp. 2d at 108 ("A terrorist attack on civilians is of course intended to cause emotional distress to the victims' families); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C. 2001) (same).

Defendants' actions caused severe emotional distress to the Fishers. Each of the Fishers has suffered severe and lasting emotional trauma as a result of virtually witnessing the immediate aftermath of the bombing of PA 103. Courts have consistently acknowledged that terrorism causes such severe emotional distress to close family members. *See Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d at 104; *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 271 (D.D.C. 2003); *Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 35-36 (D.D.C. 2003), *aff'd on other grounds*, 376 F.3d 1123 (D.C. Cir. 2004); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) (citing "significant evidence of emotional distress among the siblings" of the person taken hostage); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 50 (D.D.C. 2001) (no doubt wife "suffered significant emotional distress"); *see also Burnett,* 274 F. Supp. 2d at 108 (family members of victims of 9/11 present classic cases for intentional infliction of emotional distress).

Where terrorists design their actions to cause emotional distress to people other than those immediately effected, those people have a right to sue under state law for intentional infliction of emotional distress. *Greenbaum*, 451 F. Supp. 2d at 104-05; *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005). As one Treatise puts it:

> If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.

Dobbs, The Law of Torts, § 307 at 834 (2000).

Further, in the modern world with high-speed communications and immediate media coverage of major stories about terrorist acts – coverage that the terrorists intend to exploit to further their aims of publicizing their causes, causing pain to relatives and fear in the populace – the Fishers, like other families faced with public terrorism were "virtually" present at the place of the terrorist incident or were the actual intended targets of the terrorists acts, giving them the right to sue. *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 283-84 (D.D.C. 2005) (sibling plaintiffs not present have a right to sue for intentional infliction of emotional distress when they were quickly and explicitly informed of the attack in the media); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 and n.12 (D.D.C. 2005) (terrorist acts are directed at causing emotional trauma to family members, thus they can sue despite not being present at the scene of the terrorist act); *Burnett*, 274 F. Supp. 2d at 108 ("Family members here were not physically present at the World Trade Center, or at the Pentagon, or at Shanksville, but the whole world was virtually present, and that is enough"); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 271 (D.D.C. 2003) (immediate family members could sue Iran for intentional infliction of emotional distress though not physically present at site of terrorism); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 35-36 (D.D.C. 2001) (siblings entitled to recover for intentional infliction of emotional distress though not physically present at the site of terrorism); *see also Kilburn v. Republic of Iran*, 277 F. Supp. 2d 24, 36 (D.D.C. 2003) (upholding cause of action for intentional infliction of emotional distress by family members not physically present at site of terrorist acts); *cf. Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 67 (D.D.C. 2006)

(family member may assert cause of action under Massachusetts law when they have substantial contemporaneous knowledge of outrageous act and severe emotional distress). By allowing family members of victims of terrorist attacks to sue under the "third party" rules of Restatement 46(2) when they are virtually present through contemporaneous reports in the media, courts are simply recognizing that when terrorists commit their acts they "intended to and did cause emotional distress" to "immediate family members" of those they torture and kill. *See Burnett v. Al Baraka Investment and Development Corporation*, 274 F. Supp. 2d 86, 108 (D.D.C. 2003); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d at 50.[11]

Thus, the acts described in the complaints outline a prima facie case against the Defendants for intentional infliction of emotional distress. Further, under normal state law agency, contract, and respodeat superior principles for intentional infliction of emotional distress, Libya is liable for Al-Megrahi's acts. Libya admitted that it accepts liability for the acts of its agents, it is willing to pay damages caused by their agents, and Al-Megrahi was clearly one of its agents (Amended Complaint, ¶¶ 96-98) acting pursuant to his authority as a Libyan official and in furtherance of Libyan policy. *See Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005) (principal liable for harm foreseeably caused by agent); *DeStafano v. Grabrian*, 763 P.2d 275, 287-88 (Colo. 1988) (same); *Oaks v. Connors*, 660 A.2d 423 (Maryland App. 1995)(same); *Dias v. Brigham Medical Associates, Inc.*, 780 N.E.2d 447, 449-50 (Mass. 2002) (same); *Champion v. Nationwide*

---

[11] In the context of terrorist acts, like the bombing of PA 103, the "presence" requirement has been interpreted liberally, to allow the virtual presence described here to create a cause of action unless either the state law explicitly and definitively rules out such a result or unless the incident was too remote in time. *See Heiser v. Islamic Republic of Iran*, 2006 U.S. Dist. LEXIS 92640 (D.D.C. Dec. 22, 2006) (finding that virtual presence sufficient in terrorism cases as to states' law that followed the Restatement where no definitive contrary law existed); *Semenski v. Chapinsky*, 2003 WL 21799941 at *3 (N.D. Ill. 2003) (interpreting Restatement §46(2): "[u]nlike the 'immediate family' prerequisite, the 'presence' requirement has been given a liberal interpretation, or even waived altogether , in certain cases').

*Sec. Inc.*, 545 N.W.2d 596, 601 (Mich. 1996) (principal liable for agents acts if agency allowed commission of the acts). *See generally* Restatement (Second) of Agency, § 212 (Principal liable for agents acts if agent acting in furtherance of principles goals or at principal's instruction); Restatement (Second) of Agency, §219 (principal liable for agents acts if the agent was acting within the scope of employment or if the principal intended the agent to act or cause the consequences the agent caused).

### The Complaint States Claims Against Libya Based on Contractual Principles

Libya, because of its opened-ended guaranty of any damages caused by its agents is also liable for any damages caused by Al-Megrahi and, thus for a judgment entered under the Flatow Amendment. While the Flatow Amendment itself does not create a direct action against Libya, even through use of respondeat superior, Libya is still liable for all damages, compensatory and punitive, that may be assessed against Al-Megrahi under ordinary state law principles. S*ee Hurst*, 2007 U.S. Dist. LEXIS 7166 at *12-14.

The Fishers' allegations set forth a fairly straightforward case for holding Libya liable under a contractual theory, either under principles relating to guarantees or contracts creating rights in third parties. Libya faced continuing sanctions for its role in sponsoring terrorism – a particular example of which was the PA 103 bombing. As alleged by the Fishers, in an effort to prevent and then lift sanctions against it, Libya undertook to take responsibility for or guarantee that any damages assessed against its agents arising out of the PA 103 bombing would be paid by Libya. It was only after Libya convinced the U.S. and the U.N. that it meant the offer seriously and meant to take

responsibility pursuant to its agreement to do so that the sanctions were lifted.[12] Thus,
Libya has made a promise, either a promise directly to persons injured (at law) by the
actions of Libya's agents to compensate them and insure their damages will be paid and
can be liable as a guarantor. *See CMCB Enterprises, Inc. v. Ferguson*, 114 P.3d 90
(Colo. App. 2005) (party is liable when it issues a guarantee and is not released from its
obligation); *Highlands Ranch University Park, LLC v. Uno of Highlands Ranch, Inc.*, 129
P.3d 1020 (Colo. App. 2005) (the liability of a guarantor is co-extensive with that of the
principal obligor); *Middlebrook Tech, LLC v. Moore*, 849 A.2d 63 (Md. 2004) (a promise
to guarantee another's obligations creates an obligation to stand in or cure another party's
default); *Walton v. Washington County Hospital Association*, 13 A.2d 627, 629 (Md.
1940) (creation of a guarantee is not based upon any technical language, rather a
guarantee is a flexible, non-technical obligation); *D'Annolfo v. D'Annolfo Construction
Company, Inc.*, 654 N.E.2d 82 (Mass. App. 1995) (a party promises to take responsibility
for another's obligation liable as a guarantor); *Elms v. Osgood*, 1998 Mass. Super. LEXIS
131 (Mass. Sup. May 13, 1998) (same). Similarly, the promises made to the U.N. and the
U.S. government to accept responsibility and compensate PA 103 victims can be
enforced by the Fishers and others as intended third party beneficiaries of the promises
made to the U.S. and U.N. because the promised performance was to flow directly to
those injured by the actions of Libya's agents. *See* Restatement (Second) of Contracts, §

---

[12] That other conditions and promises were part of the ultimate bargain leading to the lifting of sanctions
and resuming of normal diplomatic relations, does not mean that Libya did not seek and receive
consideration for its promise, when this and other promises led to substantial benefits to Libya. *See*
Restatement (Second) of Contracts, § 79 (does not need to be exact equivalence or one to one quid pro quo
for valid consideration and a valid contract); § 80 ("(1) There is consideration for a set of promises if what
is bargained for and given in exchange would have been consideration for each promise in the set if
exchanged for that promise alone. (2) The fact that part of what is bargained for would not have been
consideration if that part alone had been bargained for does not prevent the whole from being
consideration.").

303 (a party may be liable to a third party beneficiary for conditional promises), § 304 (a promise creates a duty to any intended beneficiary to perform the duty and the intended beneficiary may enforce the duty); *see also E. B. Roberts Construction Company v. Concrete Contractors, Inc.*, 704 P.2d 859 (Colo. 1985) (third parties have rights as third party beneficiaries when promises are intended to benefit the third parties); *Anne Arundel County v. Fidelity & Deposit Co.*, 648 A.2d 193, 198-99 (Md. 1994) (a third party beneficiary is someone other than one of the direct parties to an agreement to whom performance of a promise is to run directly); *Flattery v. Gregory*, 489 N.E.2d 1257 (Mass. 1986) (a party is an intended third party beneficiary if performance of a promise is intended to be made to that party or similar parties); Mich. C.L.S. § 600.1405 (a right is created in third parties when there has been a binding promise made and where the performance of a promise under an agreement is to be made directly to third parties); *Williams v. R. Thomas Construction Co.*, 2006 Mich. App. LEXIS 572 at *17 (Mich. App. Mar. 2, 2006) (a defined class can be third party beneficiaries of an agreement if a promise in the agreement is intended to directly benefit members of the defined group or class); *Hammack v. Lutheran Social Services of Michigan*, 535 N.W.2d 215 (Mich. App. 1995) (same).

The only question that remains is whether a cause of action is stated against Al-Megrahi under the Flatow Amendment, for which a judgment could be entered and thus Libya liable under normal contractual principles. The Flatow Amendment provides just such a cause of action.

P.L. 104-208, Div A, Title I, § 101(c) [Title V, § 589], 110 Stat. 3009-172 (The Flatow Amendment, published as a note to 28 U.S.C. 1605), states, in relevant part:

> (a) An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 ... while acting within the scope of his or her office, employment, or agency shall be liable *to a United States national* or the national's legal representative *for personal injury* or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).
>
> (b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. 1605(f) and (g) shall also apply to actions brought under this section....

*Id.* (emphasis added).

The Flatow Amendment thus creates a cause of action for damages against agents of a foreign state – in this case, Al-Megrahi – personally. *See Cippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032-33 (D.C. Cir. 2001). Put simply, because Al-Megrahi acted for Libya or under the color of law as its agent, the Flatow Amendment makes him personally liable. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 2006 U.S. Dist. LEXIS 58033 at *25-26 (D.D.C. May 11, 2006). Indeed, this Court in *Hurst* held directly that the Flatow Amendment creates a cause of action for family members like the Fishers against Al-Megrahi in a case arising out of the bombing of PA 103. *See Hurst*, 2007 U.S. Dist. LEXIS 7166 at *28-31. Thus, because Libya's own actions in guaranteeing and accepting to take responsibility for Al-Megrahi's actions create common law obligations – apart from respondeat superior and agency – to pay the Fishers for *all* damages assessed against Al-Megrahi, Libya can be liable for any judgment entered against Al-Megrahi on the Flatow Amendment cause of action – as well as on the cause of action for intentional infliction of emotional distress.

### III.   THE CLAIMS IN THE AMENDED COMPLAINT WERE TIMELY FILED.

26

Actions brought pursuant to the waiver of sovereign immunity provided for in 28 U.S.C. § 1605(a)(7) are subject to a statutory ten-year limitations period. See 28 U.S.C. § 1605(f) ("No actions shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose."). In addition to creating a ten year statute of limitations, Congress mandated the application of equitable tolling principles in determining when the limitations period would run. More specifically, Congress mandated that "the period during which the foreign state was immune from suit, shall apply in calculating the limitations period." *Id.* Thus, the plain wording of the provisions of 28 U.S.C. § 1605(f) appears to make actions like this one, where the foreign defendants' immunity was lifted in 1996, timely if they were filed within 10 years of the effective date of 28 U.S.C. § 1605(a)(7) – April 24, 2006. *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 144-45 (D.D.C. 2005); *see Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 242 (D.D.C. 2005).

The Fishers originally outlined this position in their response to Al-Megrahi's motion to dismiss. In Al-Megrahi's opening papers in his motion to dismiss, Al-Megrahi accepted the basic premise of the Fisher's position – that the final date for commencement of an action was April 24, 2006. Al-Megrahi argued, however, that the action was untimely under Scottish law, since service was not completed until after April 24, 2006. As the Fishers pointed out in response, 28 U.S.C. § 1605(f) is a new, federal statute of limitations for actions brought pursuant to 28 U.S.C. § 1605(a)(7). *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 142-45 (D.D.C. 2005); *see Young v. United States*, 184 F.2d 587, 588-590. (D.C. Cir. 1950) (Federal Tort Claims Act's statute of limitations preempts other causes of action and creates a new statute of limitations for the

other actions).[13]  For that reason, federal law governs the construction and application of

the statute of limitations, *see Kossick v. United States*, 330 F.2d 933, 935-36 (2d Cir.

1964); *see also Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 101-02

(D.D.C. 2006), and the question of whether the action has been commenced in a timely

manner. *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984); *see Syms v. Olin

Corp.*, 408 F.3d 95, 107 (2d Cir. 2005).  Since, under federal law, an action is

commenced upon the filing of an action, not upon service, these actions were timely

commenced.

Faced with these arguments, Al-Megrahi presented a number of new positions in

his reply papers.  One of the arguments Al-Megrahi forwarded for the first time in reply

was based upon this Court's analysis of the facts in *Vine v. Republic of Iraq*, 459 F.Supp.

2d 10 (D.D.C. 2006).  (*See* Reply at pp. 14-16.)[14]  The Fishers sought an opportunity to

respond to Al-Megrahi's new arguments and this Court granted their request.  This

portion of the memorandum will address Al-Megrahi's new arguments.

Because Al-Megrahi did not explain how *Vine's* analysis applies to the facts of

this case, the exact import of his argument is unclear.  However, it seems apparent that

Al-Megrahi's invocation of *Vine* is meant to suggest that the statute of limitations expired

---

[13] *See also Maryland ex rel. Burkhardt v. United States*, 165 F.2d 869, 870-72 (4th Cir. 1947) (by waiving sovereign immunity, the FTCA creates new rights which are governed by the federal statute from the time of its passage).

[14] In his reply papers, Al-Megrahi cited *Lafferty v. St. Riel*, 397 F. Supp. 2d 602 (E.D. Pa. 2005), and *Habermehl v. Potter*, 153 F.3d 1137 (10th Cir. 1998), which address the applicability of state law principles to state law statutes of limitations, not the application of federal law principles that apply here. Al-Megrahi, for the first time, submitted a declaration purporting to prove that the Fishers did not meet the exhaustion of remedies requirement of the TVPA because they could have brought suit in Scotland – apparently assuming that the "misconduct" underlying the case took place there (without evidence arguing contrary to the Fishers' allegations – and the findings of the Scottish court which tried Al-Megrahi – that the majority if the "misconduct" – what caused the crash – took place outside of Scotland in a number of locations. Al-Megrahi also cited cases that held that complaints must be served within 120 days to be timely, but failed to note that those service issues do not apply to defendants, like Libya and Al-Megrahi, who are located outside the United States. *See* Fed. R. Civ. P. 4(m)(120 service limit does not apply to foreign defendants).

at some time before the complaints herein were filed, although when is not clear.[15]

However, given the facts of this case, the Fishers suggest that April 2006 is the earliest

date the statute of limitations could have run.[16]

    To determine whether a statute of limitations has run, the Court must first

examine when the cases of action asserted by the Fishers arose. Because 28 U.S.C. §

1605(f) is a federal statute of limitations, the Court must apply federal rules on when

causes of action accrue. *Connors v. Hallmark & Son Coal Company*, 935 F.2d 336, 341

(D.C. Cir. 1991). Under federal law, a discovery rule applies to determine when causes

of action accrue and statute of limitations begin to run. *Id.* at 342. Often described as a

"discovery of injury" rule, the discovery rule actually operates to trigger the running of a

limitations period when a party knows it has been injured and has reason to believe that a

defendant has committed some wrongdoing that creates a right against the defendant.

*Nelson v. American National Red Cross*, 26 F.3d 193, 196-97 (D.C. Cir. 1994). Thus,

even if one is unsure of which of a number of remedies might be available against a

defendant, discovery of an injury and an identification of those responsible normally

starts a limitations period running. *See Atchison, Topeka & Santa Fe Ry. Co., v. I.C.C.*,

851 F.2d 1432 (D.C. Cir. 1988) (uncertainty as to which of various available remedies

apply does not prevent the statute of limitations from running). The discovery rule serves

to prevent the time provided for in a statute of limitations from beginning to run until a

---

[15]Al-Megrahi's failure to explain and support his statute of limitations defense should lead the Court to dismiss it, because establishing the applicability of this affirmative defense is Al-Megrahi's burden. *See Rubin v. The Islamic Republic of Iran*, 436 F. Supp. 2d 938, 941 (N.D. Ill. 2006) ("statutes of limitations such as the one created by § 1605(f) are affirmative defenses").

[16] Based upon counsel's review of the *Vine* papers, none of the issues discussed herein regarding the time of accrual of the various causes of action or the application of equitable tolling principles were addressed by the *Vine* parties.

party has the facts necessary to understand that he or she has been injured and a defendant's liability for the harm. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). In other words, when a person has the relevant facts and can discover that they have a cause of action against a defendant by asking someone who could analyze the issue (for example, a lawyer), the statute of limitations begins to run. *See Cogburn v. U.S.A.*, 717 F. Supp. 958, 963 (D. Mass. 1989).

This, however, is not the ordinary case. First, even if the Fishers *knew* Libya caused the death of their brother before 1996, they would have also *known that they had no cause of action against Libya because Libya was immune*. Under any reasonable interpretation of the discovery rule, the Fishers could not have "discovered" a cause of action against Libya prior to 1996 because none existed. Second, as the cause of action under the Flatow Amendment was not created until 1996, it would have been impossible for the Fishers to discover such a cause of action before it was created – or, put another way, the action cannot logically accrue before it exists. Third, under the contract and guaranty cause of action, Libya's financial liability arises only upon a finding that Al-Megrahi is liable to a plaintiff and damages fixed,[17] so the cause of action based upon that guarantee cannot be time barred.

In addition, holding that the statute did not begin to run until 1996 and thus did not expire until April 2006 is consistent with the principles underlying both the discovery rule and the Congressional mandate to toll the statute of limitations during the time Libya was immune from suit. As a general rule, courts only apply equitable tolling in unusual

---

[17]While the cause of action technically is not ripe until damages are fixed against Al-Megrahi, the claim can be joined here as a declaratory action and monetized at the same time as the amount of any judgment against Al-Megrahi is fixed, because Libya's liability as a guarantor or under a third party beneficiary theory is co-extensive with that of Al-Megrahi.

circumstances. *Communications Vending Corporation of Arizona, Inc. v. Federal Communications Commission*, 365 F.3d 1064 (D.C. Cir. 2004). In this case, however, Congress has mandated that tolling apply to the statute of limitations and that the period a sovereign is immune from suit must be included in determining how long to "toll" the statute of limitations. 28 U.S.C. § 1605(f). In determining whether to toll statutes of limitations and the extent of such tolling, Courts look to the underlying purposes of the statute. In cases where Congress sought to provide a broadened or new remedy for conduct – and especially where Congress has mandated tolling – courts should give tolling provisions a broad reading. *See Ellis v. General Motors Acceptance Corporation*, 160 F.3d 703, 708 (11th Cir. 1998); *United States v. Barnes*, 295 F.3d 1354, 1364 (D.C. Cir. 2002) (statute should be read to effectuate its legislative purpose). Because the statute of limitations here is both a statute of limitations and a waiver of immunity and grant of subject matter jurisdiction, the Court should constrained to read the command of tolling and the statute of limitations as Congress intended and should not "assume the authority to narrow the waiver that Congress intended." *U.S. v. Kubrick*, 444 U.S. 118 (1979); *Cogburn v. U.S.A., Cogburn v. U.S.A.*, 717 F. Supp. 958, 960 (D. Mass. 1989).[18]

Congress passed the "state-sponsored terrorism exception" to the FSIA for the purpose of deterring and punishing state-sponsored terrorism. *Price*, 294 F.3d at 88. Congress also sought to create a judicial forum so that the victims of state-sponsored terrorism could seek full compensation. *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 50 (D.D.C. 2000). The state-sponsored terrorism exception to the FSIA, which was passed for the purposes of deterring state-sponsored terrorism and compensating its

---

[18] The Court's analysis in Vine addressed equitable tolling in the context of DOHSA.

victims, requires a more expansive interpretation of equitable tolling and the discovery rule than might be the case when a court calculates the applicable statute of limitations with regard to a more limited cause of action, such as the cause of action under the Death on the High Seas Act, which underlay the court's decision and the narrow application of equitable tolling in *Phillips v. Heine*, 984 F.2d 489 (D.C. Cir. 1993). In the context of FSIA, the terrorism exception to sovereign immunity and the Flatow Amendment, it makes sense to by mandating that the statute of limitations be tolled for the period of time that a sovereign was immune, Congress was excluding that period of time from 10 year FSIA limitation[19] and to hold that the causes asserted herein accrued in 1996, when 28 U.S.C. § 1605(a)(7) and the Flatow Amendment were enacted, rather than at some undefined earlier or later time.

Further, the Congressional mandate that equitable tolling apply to the determination of when the FSIA statute of limitations has run (and the policies underlying the discovery rule of claim accrual) requires that this Court examine in some detail the facts of the case to help determine whether the statute might actually begin

---

[19] So far as the Fishers are aware, every other court to have considered the issue has held that Congress intended to entirely exclude the period of time prior to 1996 from the calculation of when the statute of limitations begins to run and thus that the earliest the FSIA statute of limitations could have run is April 2006. *See, e.g., Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 242 (D.D.C. 2005); *Wyatt v. Syrian Arab Republic*, 398 F. Supp. 2d 131, 145 (D.D.C. 2005) (holding that the plaintiffs claims were not time-barred because "[u]nder the terms of § 1605(f), all claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was waived."); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (holding that the plaintiffs' actions were not time-barred because "28 U.S.C. § 1605(f) provides for a statute of limitations of '10 years after the date on which the cause of action arose,' and provides for equitable tolling during the 'period during which the foreign state was immune from suit.' . . . [and] [t]he state of Iran was immune from suit until passage of Pub. L. 104-132 . . . on April 24, 1996."); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998) ("as a matter of law that the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note will be April 24, 2006"). *See also Pohill v. Islamic Republic of Iran*, 2001 U.S. Dist. LEXIS 15322 at *13 n. 3 (D.D.C. Aug. 23, 2001) (case filed 13 years after incident and four years after enactment of 28 U.S.C. § 1605(a)(7) and § 1605(f) was timely "because the ten-year statute of limitations was tolled for the period during which Iran was immune from suit.").

running at some time later after 1996. *See United States v. BCCI Holdings (Lux.), S.A.*, 916 F. Supp.2d 1276, 1284 (D.D.C. 1996) (determination of the period of tolling is based upon an examination of the facts of the individual case). To the extent that a defendant has engaged in inequitable conduct designed to thwart the enforcement of a plaintiffs' rights, equitable tolling may be applied. *See Id.*

The Defendants here engaged in a variety of actions designed to thwart discovery of who was actually responsible for the bombing of PA 103. The bomb was devised far away from Lockerbie using components sent to Libya from around the world. The bomb was put into the stream of luggage that would bring it to PA 103 many miles from where it exploded. The Defendants used plastic explosives molded to look like a cassette recorder hidden among common items in a suitcase (items that were bought far away from the explosion site and the last stop on the plane) to thwart detection and created a chain of custody for the suitcase designed to hide its origin. The nature of the attack – a bomb placed on an international flight – is one in which much of the evidence would be incinerated or destroyed in an explosion and crash. These factors inherently made investigating the act and culpability for it almost impossible for private individuals.

Further, for an individual plaintiff, determining or investigating who was responsible for the bombing – beyond speculation – would probably be impossible. The only entities with sufficient expertise, technical and human resources to link an attack like that of PA 103 to an individual and then a country are governments with their sophisticated law enforcement techniques and intelligence gathering (and sharing). This information would not be available to the general public – and any information that might leak or be reflected in a charging document such as an indictment (which is proof of very

little in and of itself) could not be confirmed until the various governments would agree

to allow the relevant evidence to be used in open court. Because such information

involves sensitive issues of law enforcement and intelligence sources and methods, the

government would almost certainly refuse to make it public prior to a criminal trial,

arguing, among other things, that such information is exempt from disclosure under the

Freedom of Information Act as an "investigative file" in the hands of law enforcement

and that release of the information would jeopardize intelligence sources and ongoing

investigations. *See Owens v. United States Department of Justice*, 2006 U.S. Dist.

LEXIS 87145 (D.D.C. Dec. 1, 2006) (government objects to producing information on

parties responsible for terrorist acts under FOIA).[20]

Thus, when Libya avoided a criminal trial by refusing to extradite Al-Megrahi

and another Libyan national until 1999, Libya and Al-Megrahi effectively prevented key

information that would have allowed the Fishers to make a reasoned determination as to

whether Libya was actually responsible for PA 103 and their emotional injuries. Libya

itself had not accepted responsibility until 2003 according to the U.N. and the U.S.

government, both of which continued sanctions against Libya. Libya's actions in

planning the attack on PA 103 and then attempting to hide its culpability should prevent

the statute of limitations from running until the evidence had been aired at Al-Megrahi's

---

[20] Indeed, on February 1, 2007, in *Owens v. United States Department of Justice*, Civil Action No: 1:04-CV-1701 (JDB), the United States Department of Justice filed a brief objecting to producing any materials concerning who might be responsible for a terrorist attack because (a) release of strategic information might enable potential suspects to circumvent investigative techniques and thus be likely to interfere with enforcement proceedings; (b) release of documents containing information from other law enforcement and intelligence agencies could allow suspects to take evasive action to avoid capture, endanger the lives of sources, and allow individuals to take actions to impede ongoing investigations; and (c) release of evidence could permit subjects to prematurely gain information on how to contravene evidence in any criminal trial. *See* U.S. DOJ Memorandum of Law, attached hereto as Exhibit C.

criminal trial. At that time, much of the evidence of Libyan and Al-Megrahi's culpability became public for the first time.

In an equitable tolling analysis, a court must weigh the balance between the competing interests of the plaintiff and defendant. *See United States v. BCCI Holdings (Lux.), S.A.*, 916 F. Supp.2d 1276, 1284 (D.D.C. 1996). Since one of the purposes of statutes of limitations is insuring that sound evidence can be presented and that defendants are not presented with claims they cannot anticipate from the past, *Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993), the preservation and production of relevant evidence due to the Al-Megrahi's criminal trial and his ongoing appeals has actually improved the quantity and quality of information available. Further, where Defendants seek to evade justice and prevent the exposure of their role – as Libya and Al-Megrahi did here – their interests should be subordinated to the interests of the Fishers, victims of the Defendants' terrorism, in obtaining compensation for their severe and long-lasting injuries, and ensuring that Libya is held accountable for its sponsorship of terrorism. *See United States v. BCCI Holdings (Lux.), S.A.*, 916 F. Supp. 2d 1276, 1284 (D.D.C. 1996); *EEOC v. O'Grady*, 857 F.2d 383, 393 (7th Cir. 1988) ("Although statutes of limitations protect defendants from the burden of defending stale claims, this interest may be outweighed 'where the interests of justice require vindication of the plaintiff's rights.'"). Thus, given all the circumstances and interests at issue here, the most reasonable interpretation of the mandates of 28 U.S.C. § 1605(f) is that the causes of action asserted against Libya and Al-Megrahi are timely.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court issue the

proposed orders denying the motions to dismiss filed by Defendants.


Dated: February 28, 2007
Washington, D.C.

Respectfully submitted,


_____/s/ Paul M. Tendler_____

Paul M. Tendler
The Law Offices of Paul M. Tendler
1250 Connecticut Avenue, NW, Suite 200
Washington, D.C. 20036
Telephone: 202 682-9000
Facsimile: 202 403-3640