'EXHIBIT A'



# NEWS RELEASE

## ABDELBASET ALI MOHMED AL MEGRAHI

28 June 2007

**The Scottish Criminal Cases Review Commission ("the Commission") has today referred the case of Abdelbaset Ali Mohmed Al Megrahi ("the applicant") to the High Court of Justiciary.**

As a result of the Commission's decision the applicant is entitled to a further appeal against his conviction for the murder of 270 people who died following the bombing of Pam Am flight 103 over Lockerbie, Scotland on 21 December 1988.

In accordance with the Commission's statutory obligations, a statement of the reasons for its decision has been sent to the High Court, the applicant, his solicitor, and Crown Office. The Commission has no power under statute to make copies of its statements of reasons available to the public. However, given the worldwide interest in this case, and the fact that there has been a great deal of press and media speculation as to the nature of the grounds of review, the Commission has decided to provide a fuller news release than normal. Accordingly, a brief summary of some of the Commission's main findings in the case is given below.

As the full statement of reasons extends to over 800 pages and is accompanied by a further thirteen volumes of appendices it is not possible to reflect the detail or complexity of the issues that have been addressed by the Commission. This news release is intended therefore merely to assist in an understanding of the nature of the Commission's main investigations and findings and does not form part of its decision in the case.

Announcing the decision today, the Chairman of the Commission the **Very Rev. Dr Graham Forbes CBE** said: - *"The Commission has a very special role within the Scottish Criminal Justice system, and has been given extensive statutory powers to enable it to carry out this role. The function of the Commission is not to decide upon the guilt or innocence of an applicant. We are neither pro-Crown nor pro-defence. Our role is to examine the grounds of review identified, either by the applicant, a third party or by our own investigations, and to decide whether any of the grounds meet our statutory test. I am satisfied that the Commission has vigorously and independently scrutinised the many grounds of review in this particular application, and has now produced a lengthy and detailed statement of reasons which I believe comprehensively deals with all of the issues raised."*

1

Provost Forbes continued:- *"It would have been impossible for us to have completed our investigation without the cooperation of other public and government bodies both at home and abroad, and we readily acknowledge this help. I would emphasise however that neither Scottish Ministers nor the Scottish Executive Justice Department, nor for that matter any other official body, has at any time sought to influence or interfere in the Commission's investigations; and all requests for appropriate grant aid to enable a full and comprehensive investigation and review have been properly met, without question.*

*This has been a difficult case to deal with. The Commission's enquiry team have worked tirelessly for over three years. Some of what we have discovered may imply innocence; some of what we have discovered may imply guilt. However, such matters are for a court to decide. The Commission is of the view, based upon our lengthy investigations, the new evidence we have found and other evidence which was not before the trial court that the applicant may have suffered a miscarriage of justice. The place for that matter to be determined is in the appeal court, to which we now refer the case."*

**Gerard Sinclair**, the Chief Executive of the Commission said today: - *"This has clearly been a unique case for the Commission in many ways, not least, in terms of the universal press and media interest. It has certainly been the longest, the most expensive and singularly most complex case we have had to investigate and review. I am pleased that after a full and thorough investigation we are now able to produce our statement of reasons. It has been difficult at times to ignore, and to refrain from commenting upon, the almost constant speculation regarding this review, much of which I have to say has been either inaccurate or simply incorrect. I hope however that the comprehensive statement of reasons which the Commission has now produced for the parties will answer the many questions which have been raised over the last 3 years. The Commission's involvement in the case is now at an end. It is a matter entirely for those representing the Crown and the defence at any future appeal to decide whether they wish to rely upon the conclusions reached by the Commission, or develop arguments of their own. Thereafter, it will be for the appeal court to decide whether there has been a miscarriage of justice in this case."*

2

## 1.0 Background

**1.1** On 31 January 2001, following a trial at the High Court of Justiciary sitting in the Netherlands ("the trial court"), the applicant, a Libyan national, was convicted by three Scottish judges of murdering those who died as a result of the bombing of PA103. A co-accused, Al Amin Khalifa Fhimah, also a Libyan, was found not guilty. The applicant's appeal against conviction was rejected by the High Court on 14 March 2002. Although appeals by both the Crown and the applicant in relation to the sentence are still ongoing, those proceedings are entirely separate from the Commission's role in the case which concerned only the conviction.

## 2.0 The Review

**2.1** The applicant applied to the Commission for a review of his conviction on 23 September 2003. The application, which comprised 16 separate volumes of submissions and supporting materials, contained numerous grounds on which it was argued the case should be referred to the High Court. In February 2004 the Commission allocated the case to an investigative team consisting of a senior legal officer (Robin Johnston) and two legal officers (Andrew Beadsworth and Gordon Newall). An additional legal officer (Michael Walker) was involved in the case on a part time basis.

**2.2** Throughout 2004 the firm of solicitors representing the applicant at that time lodged with the Commission a further five sets of submissions, the contents of which significantly broadened the scope of the initial application. The Commission also received and considered numerous submissions from other parties.

**2.3** Correspondence was also received from the relatives of some of the victims who enquired mainly as to progress in the investigation.

**2.4** During its investigation of the case the Commission had access to a wide range of materials including the following:

- the transcript of the evidence and submissions at trial;
- the Crown and defence productions at trial;
- all witness statements obtained by the police during its investigation including an electronic database of over 15,000 such statements;
- copies of all witness statements obtained by the Crown in preparation for the trial;
- the correspondence files prepared by the firm of solicitors which acted for the applicant at trial and in his appeal against conviction, and copies of all witness statements obtained by them from witnesses based in the United Kingdom;
- an electronic database consisting of all information held on the case by the firm of solicitors which acted for co-accused at trial.

3

**2.5** As the custodians of much of the evidence in the case, Dumfries & Galloway Police were the Commission's principal source of additional information, receiving over 200 separate written requests for information from the Commission. In addition numerous visits were made to Dumfries police office where members of the enquiry team were given access to material held there. The Commission's enquiry team was also given access to materials held by the Forensic Explosives Laboratory at Fort Halstead, Kent, which dealt with the forensic examination of items during the police investigation. A substantial amount of information was also obtained from other agencies including Crown Office and the Security Service.

**2.6** The Commission's further enquiries were wide-ranging and took place in the United Kingdom, Malta, Libya and Italy from 2004 onwards. As well as examining the information provided to it, the Commission interviewed a further 45 witnesses, including the applicant and his co accused Mr Fhimah. Many of these interviews were conducted over several days and a number of the witnesses required to be seen on more than one occasion. Enquiries in Malta and Italy also involved the recovery of official records from various bodies.

**2.7** As the Commission's statutory powers do not extend beyond Scotland, some difficulties were encountered where witnesses living in other countries refused to be interviewed. In the majority of cases these difficulties were resolved through discussions with the individuals concerned, but in respect of several witnesses living in Malta this was not possible. Accordingly at an early stage of the review an approach was made to the Attorney General of Malta to establish whether the Commission could make use of the provisions of Maltese law to obtain statements from the witnesses concerned. The Commission was advised by the Attorney General that in order to do so a written agreement between the United Kingdom and Malta would be required. Following a meeting with the Foreign and Commonwealth Office ("FCO"), in July 2005 the Commission drafted and sent such an agreement to the FCO which thereafter forwarded it to the Maltese authorities. After lengthy negotiations the agreement was signed by the United Kingdom and Maltese authorities in June 2006. The witnesses in question were interviewed by the Commission's enquiry team in August of that year.

**2.8** The Commission continued to interview witnesses and examine productions during 2006 and 2007, and concluded its investigations in April 2007. Between the initial submissions and the additional submissions received during the course of the review, the Commission identified a total of 48 principal grounds for consideration and review by the Commission. In addition, as a result of our own investigations the Commission identified some further potential grounds of review. Many of the original grounds were the subject of numerous separate submissions and allegations submitted over many hundreds of pages. In relation to 45 of the original 48 grounds identified, the Commission has concluded that it does not believe that a miscarriage of justice has occurred. Of the remaining grounds, some of which resulted from the Commission's own investigations, the Commission has identified 6 grounds where it believes that a miscarriage of justice may have

4

occurred and that it is in the interests of justice to refer the matter to the court of appeal.

### 3.0   The evidence at trial

**3.1**   In order to understand the Commission's findings in the case it is helpful to summarise the evidence on which the applicant's conviction is based.

**3.2**   The trial court found that the bomb which destroyed PA103 was contained within a Toshiba RT-SF16 radio cassette player which had been placed inside a brown hardshell Samsonite suitcase (known as "the primary suitcase"). Also established to have been inside the primary suitcase were twelve items of clothing and an umbrella, a number of which were traced to a shop called Mary's House in Sliema, Malta. When interviewed by the police, the proprietor of Mary's House, Anthony Gauci, recalled selling many of the items to a man he described as Libyan.

**3.3**   It was established that the bomb had been triggered by a digital timer known as an MST-13 which was manufactured by a firm based in Switzerland named MEBO. The trial court accepted the evidence given by one of the partners in that firm, Edwin Bollier, that in 1985 and 1986 he had supplied 20 sample MST-13 timers to Libya.

**3.4**   The trial court also found that the primary suitcase had been placed on board Air Malta flight KM180 from Malta to Frankfurt where it was transferred via the baggage system to Pam Am flight 103A ("PA103A") from Frankfurt to Heathrow, and thereafter to PA103 itself.

**3.5**   The evidence relied upon by the trial court to convict the applicant was as follows:

- Anthony Gauci's evidence that the purchaser of the items resembled the applicant "a lot".

- Evidence from various sources that Mr Gauci sold the items on 7 December 1988, a date on which the applicant was proved to be in Malta staying in a hotel close to Mary's House.

- Evidence that on 20-21 December 1988 the applicant was in Malta travelling on a "coded" passport (i.e. a passport in a false name issued by the Libyan passport authority); and that on 21 December 1988 he was at Luqa airport at a time when baggage for flight KM180 was being checked in.

- Evidence that in 1985 the applicant was a member of the Libyan intelligence service ("JSO", later named "ESO") and until January 1987 was head of the airline security section of that organisation.

5

- Evidence of the applicant's association with Mr Bollier and with various members of the JSO and Libyan military who purchased MST-13 timers from him.

## 4.0   Main grounds that were rejected by the Commission

**4.1**   The following is a summary of some of the Commission's main findings on the grounds of review which were not accepted by the Commission, and accordingly do not form part of the grounds of referral.

- In the initial application to the Commission, reference was made to a former police officer who, it was alleged, worked at a senior level in the police investigation and could provide "sensitive" information about the case. A number of the allegations made on behalf of the applicant were based on information apparently provided by this witness. The true identity of the witness was not disclosed in the application; instead, a pseudonym, "the Golfer", was used. The Commission's enquiry team interviewed the Golfer, a former detective sergeant, on three separate occasions during which he made a number of allegations concerning the conduct of the police investigation. As a result of its enquiries the Commission is satisfied that the Golfer was involved in the police investigation into the bombing of PA103. However, there was a vast array of inconsistencies and contradictions between, and sometimes within, his statements to the Commission. There were also inconsistencies between what he told the Commission and what the submissions alleged he had told the applicant's former legal representatives. In addition the Commission considered some of his allegations to be implausible when considered alongside other evidence in the case, and unsupported or refuted when viewed in the context of the Commission's other findings (see below). In light of this the Commission has serious misgivings as to the credibility and reliability of this witness and was not prepared to accept his allegations.

- Many of the initial and additional submissions received on behalf of the applicant sought to challenge the origin of various items which the trial court accepted were within the primary suitcase. The items in question consisted of a Slalom-make shirt, a pair of Yorkie-make trousers, a babygro and the instruction manual relating to the Toshiba radio cassette player used to conceal the explosive device. To some extent the submissions were based upon allegations said to have been made by the Golfer. Underlying each of them was a suspicion about the conduct of the investigating authorities who, it was alleged, had manipulated, altered or fabricated statements, productions and other records in order to make out a case against the applicant. The Commission conducted extensive investigations into each of the allegations and is satisfied there is no proper basis for any of them. The allegations were further undermined by records recovered by the Commission from the Forensic Explosives Laboratory.

6

- The additional submissions also sought to cast doubt on the origin of a fragment of circuit board recovered by forensic scientists which the trial court accepted had been part of the MST-13 timer that triggered the bomb. Underlying those submissions was the allegation that evidence of the timer fragment had been fabricated in order to implicate Libya in the bombing. The Commission undertook extensive enquiries in this area but found nothing to support that allegation or to undermine the trial court's conclusions in respect of the fragment.

- Various materials were submitted to the Commission in connection with the evidence given at trial by Mr Allen Feraday, one of the forensic scientists involved in the case. It was pointed out that the Court of Appeal in England had overturned a number of convictions which had been based, at least in part, on Mr Feraday's evidence. The Commission examined papers relating to each of the cases and is satisfied that the evidence given by Mr Feraday on those occasions was different in nature from that which he gave at the applicant's trial. Furthermore, Mr Feraday's evidence concerning the origins of the timer fragment was largely supported by experts instructed by the defence prior to the trial.

- A substantial number of allegations were made to the Commission regarding the manner in which the applicant was represented by the legal advisers who acted for him at his trial and his appeal against conviction. The allegations were wide-ranging and covered failures to prepare and present the applicant's defence and to advance legal argument on his behalf. As part of its investigations regarding these claims the Commission conducted lengthy interviews with several members of the applicant's former defence team. However, applying the tests which have been set down by the High Court in previous cases dealing with such matters, the Commission did not consider the allegations to be well-founded.

- The Commission also investigated claims that a former police officer who was involved in searches of the area around Lockerbie after the crash had found a "CIA badge" but had been told by colleagues that such items were not to be recorded as evidence. As part of its enquiries into this allegation the Commission interviewed the officer concerned. It also took statements from another officer who it was alleged had been present when the badge was found, and from the senior investigating officer at the time. Both of these witnesses disputed the officer's claims and the Commission's other enquiries established nothing that might support the claims. Accordingly the Commission was not prepared to accept the officer's allegations.

- It was also alleged in the submissions that items found at the scene of the crash had been "spirited away" and that there had been "unofficial CIA involvement" in the recovery and examination of these. One such item was a suitcase belonging to one of the passengers on PA103,

7

Major Charles McKee. Despite extensive enquiries the Commission found no evidence to suggest that anyone other than Scottish police officers came into contact with Major McKee's suitcase at the scene of the crash. The Commission also found no evidence to support the allegation that a hole had been cut in Major McKee's suitcase in order to gain ac ess to its contents.

- Since the time of the bombing numerous allegations have circulated concerning the possible involvement of Khaled Jaafar, a passenger on PA103 who boarded PA103A at Frankfurt. A number of those allegations were repeated in submissions made to the Commission. The results of the Commission's enquiries in this connection provide no support for the claim that Mr Jaafar was involved, wittingly or unwittingly, in the bombing.

**5.0   Grounds of referral**

**5.1**   The following is a brief summary of some of the Commission's main findings on the grounds of review which formed the basis of the grounds of referral:

- A number of the submissions made on behalf of the applicant challenged the reasonableness of the trial court's verdict, based on the legal test contained in section 106(3)(b) of the Criminal Procedure (Scotland) Act 1995. The Commission rejected the vast majority of those submissions. However, in examining one of the grounds, the Commission formed the view that there is no reasonable basis in the trial court's judgment for its conclusion that the purchase of the items from Mary's House, took place on 7 December 1988. Although it was proved that the applicant was in Malta on several occasions in December 1988, in terms of the evidence 7 December was the only date on which he would have had the opportunity to purchase the items. The finding as to the date of purchase was therefore important to the trial court's conclusion that the applicant was the purchaser. Likewise, the trial court's conclusion that the applicant was the purchaser was important to the verdict against him. Because of these factors the Commission has reached the view that the requirements of the legal test may be satisfied in the applicant's case.

- New evidence not heard at the trial concerned the date on which the Christmas lights were illuminated in the area of Sliema in which Mary's House is situated. In the Commission's view, taken together with Mr Gauci's evidence at trial and the contents of his police statements, this additional evidence indicates that the purchase of the items took place prior to 6 December 1988. In other words, it indicates that the purchase took place at a time when there was no evidence at trial that the applicant was in Malta.

8

- Additional evidence, not made available to the defence, which indicates that four days prior to the identification parade at which Mr Gauci picked out the applicant, he saw a photograph of the applicant in a magazine article linking him to the bombing. In the Commission's view evidence of Mr Gauci's exposure to this photograph in such close proximity to the parade undermines the reliability of his identification of the applicant at that time and at the trial itself.

- Other evidence, not made available to the defence, which the Commission believes may further undermine Mr Gauci's identification of the applicant as the purchaser and the trial court's finding as to the date of purchase.

### 6.0    Interests of justice test

**6.1**    Before referring a case to the High Court the Commission must be satisfied not only that a miscarriage of justice may have occurred but also that it is in the interests of justice that a reference be made.

**6.2**    In determining whether it was in the interests of justice to refer the case the Commission considered a range of matters. These included the various statements which the applicant gave to his legal representatives before the trial in which he set out his position in respect of the allegations against him. It also included the statements which the applicant gave to the Commission. Although there were a number of inconsistencies and contradictions in these accounts, the Commission did not consider the contents of these statements justified the refusal of the case in the interests of justice.

**6.3**    The Commission also took into account a letter submitted by Libya to the United Nations Security Council in 2003 in which it accepted "responsibility for the actions of its officials" in the "Lockerbie incident". However, as the Commission did not view the letter as amounting to confirmation by Libya of the applicant's guilt, it did not believe that its terms justified refusing his case in the interests of justice.

**6.4**    Accordingly, the Commission has now referred the case of the applicant to the High Court of Justiciary.

### 7.0    Media Speculation over the last 3 years

**7.1**    The Commission has refrained from commenting publicly upon the many articles and stories which have appeared in the press and media during the time of its review of this case. It is fair to say however that much of the information that has been written about the Commission's investigations has been either inaccurate or incorrect. This can only have been upsetting to many of the parties involved in this matter, including the applicant, witnesses at the trial and the families of the victims.

9

**7.2** As recently as within the last week there has been a great deal of media speculation about what is contained within the Commission's statement of reasons, and the reasons for a referral. The Commission is satisfied that the confidentiality of both its enquiries, and the content of its statement of reasons have remained entirely secure during the whole of the review period, and that there has been no leakage of information from within the organisation. Many of the press reports published during the review have simply involved a repetition of certain of the original defence submissions received by the Commission at the beginning of its review, and which have formed the basis of a large part of the Commission's investigation. As indicated in this release, the Commission has concluded after full and proper investigation that these submissions are unsubstantiated and without merit. In particular the Commission has found no basis for concluding that evidence in the case was fabricated by the police, the Crown, forensic scientists or any other representatives of official bodies or government agencies.

**7.3** The Commission hopes that, by providing additional information in its short summary of some of the grounds of review and of the conclusions reached, this will end some of these inaccurate reports. The statement of reasons obviously deals with all of these matters in substantially greater detail.

**Other information**

**8.0** The total cost of reviewing the case to date has been £1,108,536. The majority of costs have been in relation to office accommodation, investigation costs including travel, staff salaries and fees of Board members. The breakdown of cost on an annual basis is as follows:

| Year | Cost |
|---|---|
| 2003-04 | £41,000 |
| 2004-05 | £274,892 |
| 2005-06 | £361,562 |
| 2006-07 | £369,785 |
| 2007-08 (Anticipated) | £61,297 |
| **Total** | **£1,108,536** |

**Please note: no further comment will be made by the Commission on the case.**

10

**NOTES FOR EDITORS**

When issuing a press release the Commission normally attaches a brief background note on the work of the Commission for the benefit of editors. As this case is likely to attract additional media interest beyond the Scottish media, the Commission has prepared this expanded note, which is provided for your assistance. In addition to the news release, although the Commission will not be giving any interviews regarding its decision, stock video footage of the Commissions' offices will be available from BBC Scotland at no cost by contacting the Planning Department, telephone 0141 338 2760, email scottish.planning@bbc.co.uk

You may also wish to note that the Commission's annual report for the year 2006/07 will be published and available on the Commission's website from the beginning of July 2007.

### 9.0   The Commission

### 9.1   Background

The Commission is an independent, public body which was established in 1999 by section 194A of the Criminal Procedure (Scotland) Act 1995 as amended. It has responsibility for reviewing alleged miscarriages of justice in Scotland.

Under section 194B of the 1995 Act, the Commission has the power to refer to the High Court of Justiciary any conviction or sentence passed on a person, whether or not an appeal against the conviction or sentence has been heard and determined previously. The consequence of a reference is that the High Court hears an appeal in the case.

**Section 194C of the Act provides the statutory test that the Commission must apply in reviewing a case. This test, which is different from the test applied by the CCRC in England, provides that the Commission may refer a case where it believes that:-**

**(a)   a miscarriage of justice may have occurred; and**
**(b)   it is in the interests of justice that a reference should be made.**

**N.B.** The Commission do not assess whether a conviction is "unsafe", as this is an English test.

Details of the tests, and how they may be applied, can be found on the Commission's website, www.sccrc.org.uk.

The Commission has a statutory obligation to provide statements of reasons for its decisions. In referral cases the statement of reasons is sent to the High Court, the applicant concerned (and his representatives, if any) and Crown

11

Office. In cases in which the Commission decides not to refer a case, its statement of reasons is sent only to the applicant and any representatives.

A decision by the Commission to refer a case to the High Court does not guarantee the success of the subsequent appeal. A reference is simply an indication to the court that a miscarriage of justice may have occurred and that it is in the interests of justice for the court to consider the case. Once a decision is made by the Commission to refer a case its role in the matter is at an end and it is the responsibility of the applicant or his legal representatives to decide upon and formulate the grounds of appeal and thereafter to present the appeal.

In order to assist in its investigation of cases the Commission has the power to apply for an order from the High Court for the production of documents held by a person or public body. In addition, where a witness refuses to provide a statement the Commission may apply to a sheriff for a warrant compelling that person to do so. During 2006-07 the Commission did not require to use either of these powers.

The Commission operates under statutory non-disclosure provisions whereby, subject to certain statutory exceptions, it is a criminal offence for any Member of the Board or employee to disclose information obtained by the Commission in the exercise of any of its functions.

The Commission's governing legislation is posted on its website, www.sccrc.org.uk.

### 9.2   The Review Process

The Board of the Commission is responsible for deciding whether or not cases should be referred to the High Court. All applications received by the Commission are initially considered by the Chief Executive before a recommendation is made to the Board on whether or not to accept, reject or continue the case for further information.

If accepted for full review, the case is allocated to one or more Legal Officers and the investigation process commences in accordance with the Commission's case handling procedures. These procedures are set out in full on the Commission's website, www.sccrc.org.uk.

The main focus of reviews carried out by the Commission is the grounds presented by the applicant, although the Commission may investigate cases more widely if it considers this appropriate.

If the Commission decides not to refer a case to the High Court, an interim statement of reasons will be issued to the applicant and his representatives. The applicant is then given a period of 21 days in which to submit any further representations to the Commission. Any requests to extend this period will be considered by the Board of the Commission. If no further representations are

submitted, a letter will be issued after the 21 day period has expired stating that the Commission has decided finally not to refer the case.

If further representations are submitted these are considered by the Commission which may decide to carry out further enquiries. If the Board of the Commission is of the view that no further issues have been raised which cause it to believe that a miscarriage of justice may have occurred then a supplementary statement of reasons is issued. This details any additional enquiries undertaken since the issue of the interim statement of reasons and confirms the decision not to refer the case to the High Court.

Where the Board of the Commission considers that the further representations suggest that a miscarriage of justice may have occurred, it may reverse its interim decision and refer the case to the High Court.

### 10.0   Case Statistics

### 10.1   Summary

As at 31 March 2007, the Commission had reviewed 841 cases, of which 67 were referred to the High Court. As at that date the Commission had received a total of 887 cases since its establishment in April 1999.

### 10.2   High Court Referrals

As at 31 March 2007, the Commission had referred a total of 67 cases to the High Court, 39 of which have so far been determined. Of these, 25 appeals have been granted, 11 rejected and 3 abandoned.

### 11.0   Board Members

The Board of the Commission currently operates with eight Members, one of whom is the Chair, all of whom are appointed by Royal Warrant on the advice of Scottish Ministers. Board Member appointments are made in line with the Code of Practice issued by the Commissioner for Public Appointments in Scotland.

The Chair of the Commission is the Very Reverend Graham Forbes CBE, Provost of St Mary's Cathedral, Edinburgh. Board Membership currently comprises: Sir Gerald Gordon Q.C. CBE; Sheriff Ruth Anderson Q.C.; Professor Peter Duff, Professor of Criminal Justice at Aberdeen University; Mr David Belfall, retired senior civil servant (Mr Belfall was not involved in the review of Mr Megrahi's case); Mr James MacKay, retired Deputy Chief Constable of Tayside Police; Mr Graham Bell Q.C.; and Mr Robert Anthony Q.C., who was appointed on 26 March 2007.

During 2006-07, a further 3 new Board Members were appointed in order to replace three outgoing Board Members in 2007-08. Professor Brian Caddy,

Mr Stewart Campbell and Mr Gerard McClay will all take up their appointments from 1 July 2007.

### 12.0  Staff

The Commission's full time staff complement consists of a chief executive (Mr Gerard Sinclair), a director of administration (Mr Chris Reddick), a senior legal officer (Mr Robin Johnston), 8 legal officers and 3 administrative support staff. Staffing levels are monitored closely in line with case volumes on an ongoing basis.

For any general information about the Commission please contact Mr Chris Reddick, Director of Administration, SCCRC, 5th Floor Portland House, 17 Renfield Street, Glasgow, Tel: 0141 270 7030, e-mail: creddick@sccrc.org.uk or visit the Commission's website at www.sccrc.org.uk

14