# EXHIBIT A

# MACKECHNIE & ASSOCIATES
## ──── s o l i c i t o r s ────

20th June 2005

**BY FAX  001 215 923 2227**
Dante Mattioni
Mattioni
Counselors at Law
399 Market Street
2nd Floor
Philadelphia PA19106
UNITED STATES OF AMERICA

Our Ref: EMM/PR

Dear Mr. Mattioni,

**M. Victoria Cummock et al  v  Megrahi and Others**

Further to my faxed letter sent on Saturday I now attach a copy of the Affidavit sworn by me duly notarised.  I have not attempted to fax the Exhibits referred to but could attempt to do so if that is necessary.

I confirm that couriers have collected the notarised Affidavit and the various Exhibits and that these are on their way to you but may not reach you until Wednesday. In any event, please be good enough to let me know when the originals have been received.

Yours sincerely,

Edward M. MacKechnie.

Edward M. MacKechnie • Solicitor in Scotland, England and Wales

27a Park Circus • Glasgow G3 6AP
Tel: 0141 331 1199 • Fax: 0141 332 9494 • Mobile: 07771 934983 • Email: eddiemackechnie@yahoo.co.uk

**AFFIDAVIT**

of

**EDWARD MACIVER MACKECHNIE**

Solicitor, MacKechnie & Associates,
27A Park Circus,
Glasgow,
G3 6AP

At Glasgow on the Eighteenth day of June 2005 before Vincent Connor, Notary Public, Glasgow compeared EDWARD MACIVER MACKECHNIE, Solicitor, MacKechnie & Associates, 27A Park Circus, Glasgow, G3 6AP who being solemnly sworn depones as follows:

1. My name is Edward MacIver MacKechnie. My address is c/o MacKechnie & Associates, 27A Park Circus, Glasgow, G3 6AP. I am 55 years of age. I qualified as a Scottish Solicitor in 1972 having completed the requisite period of professional training following my graduation (Bachelor of Laws) from the University of Glasgow in 1970. I have practised as a Solicitor in Scotland, doing exclusively Court work and Arbitrations, from 1972 until the present date. I am also a Notary Public and, since June 1993, I have also been an admitted Solicitor in England and Wales.

2. Between 1972 and 1975 I was employed as a Court Solicitor by a firm in Hamilton, Strathclyde and then by a larger firm (Bishop & Co) in Glasgow. In 1975 I became a Partner in Bishop & Co and effectively founded its Litigation Department. I led that Department from 1975 until 1986. In the period between 1972 and 1986 I acted in a wide variety of Court cases many of which were criminal. In 1986 I left Bishop & Co to become a Court Partner in probably Scotland's largest legal practice at that time (McGrigor Donald, now known as McGrigors). I was a Partner in that firm until I retired in December 2001. In early 2002 I formed MacKechnie & Associates. I am the sole Partner and employ now only three persons, two of whom are investigators. Also in 2002 I became a consultant to the firm of Masons (now Pinsent Masons) with offices throughout the United Kingdom and various localities worldwide.

3. In large measure, between 1986 and 1999 my work concerned complex building and civil engineering cases, mostly on the dispute resolution side. I also acted in a number of intellectual property matters of some size.

4. In about April or perhaps early May 1999 one of my Partners mentioned to me that he had heard, through his involvement with the Law Society of Scotland, that "Libya" was looking to appoint Solicitors

05\131663.1

# MACKECHNIE & ASSOCIATES
## ──── s o l i c i t o r s ────

20th June 2005

**BY FAX  001 215 923 2227**
Dante Mattioni
Mattioni
Counselors at Law
399 Market Street
2nd Floor
Philadelphia PA19106
UNITED STATES OF AMERICA

Our Ref: EMM/PR

Dear Mr. Mattioni,

**M. Victoria Cummock et al v Megrahi and Others**

Further to my faxed letter sent on Saturday I now attach a copy of the Affidavit sworn by me duly notarised. I have not attempted to fax the Exhibits referred to but could attempt to do so if that is necessary.

I confirm that couriers have collected the notarised Affidavit and the various Exhibits and that these are on their way to you but may not reach you until Wednesday. In any event, please be good enough to let me know when the originals have been received.

Yours sincerely,

Edward M. MacKechnie.

Edward M. MacKechnie • Solicitor in Scotland, England and Wales

27a Park Circus • Glasgow G3 6AP
Tel: 0141 331 1199 • Fax: 0141 332 9494 • Mobile: 07771 934983 • Email: eddiemackechnie@yahoo.co.uk

**AFFIDAVIT**

of

EDWARD MACIVER MACKECHNIE

Solicitor, MacKechnie & Associates,
27A Park Circus,
Glasgow,
G3 6AP

At Glasgow on the Eighteenth day of June 2005 before Vincent Connor, Notary Public, Glasgow compeared EDWARD MACIVER MACKECHNIE, Solicitor, MacKechnie & Associates, 27A Park Circus, Glasgow, G3 6AP who being solemnly sworn depones as follows:

1. My name is Edward MacIver MacKechnie. My address is c/o MacKechnie & Associates, 27A Park Circus, Glasgow, G3 6AP. I am 55 years of age. I qualified as a Scottish Solicitor in 1972 having completed the requisite period of professional training following my graduation (Bachelor of Laws) from the University of Glasgow in 1970. I have practised as a Solicitor in Scotland, doing exclusively Court work and Arbitrations, from 1972 until the present date. I am also a Notary Public and, since June 1993, I have also been an admitted Solicitor in England and Wales.

2. Between 1972 and 1975 I was employed as a Court Solicitor by a firm in Hamilton, Strathclyde and then by a larger firm (Bishop & Co) in Glasgow. In 1975 I became a Partner in Bishop & Co and effectively founded its Litigation Department. I led that Department from 1975 until 1986. In the period between 1972 and 1986 I acted in a wide variety of Court cases many of which were criminal. In 1986 I left Bishop & Co to become a Court Partner in probably Scotland's largest legal practice at that time (McGrigor Donald, now known as McGrigors). I was a Partner in that firm until I retired in December 2001. In early 2002 I formed MacKechnie & Associates. I am the sole Partner and employ now only three persons, two of whom are investigators. Also in 2002 I became a consultant to the firm of Masons (now Pinsent Masons) with offices throughout the United Kingdom and various localities worldwide.

3. In large measure, between 1986 and 1999 my work concerned complex building and civil engineering cases, mostly on the dispute resolution side. I also acted in a number of intellectual property matters of some size.

4. In about April or perhaps early May 1999 one of my Partners mentioned to me that he had heard, through his involvement with the Law Society of Scotland, that "Libya" was looking to appoint Solicitors

# MACKECHNIE & ASSOCIATES
## ———solicitors———

20th June 2005

**BY FAX  001 215 923 2227**
Dante Mattioni
Mattioni
Counselors at Law
399 Market Street
2nd Floor
Philadelphia PA19106
UNITED STATES OF AMERICA

Our Ref:  EMM/PR

Dear Mr. Mattioni,

**M. Victoria Cummock et al v Megrahi and Others**

Further to my faxed letter sent on Saturday I now attach a copy of the Affidavit sworn by me duly notarised.   I have not attempted to fax the Exhibits referred to but could attempt to do so if that is necessary.

I confirm that couriers have collected the notarised Affidavit and the various Exhibits and that these are on their way to you but may not reach you until Wednesday.  In any event, please be good enough to let me know when the originals have been received.

Yours sincerely,

Edward M. MacKechnie.

Edward M. MacKechnie • Solicitor in Scotland, England and Wales

27a Park Circus • Glasgow G3 6AP
Tel: 0141 331 1199 • Fax: 0141 332 9494 • Mobile: 07771 934983 • Email: eddiemackechnie@yahoo.co.uk

**AFFIDAVIT**

of

EDWARD MACIVER MACKECHNIE

Solicitor, MacKechnie & Associates,
27A Park Circus,
Glasgow,
G3 6AP

At Glasgow on the Eighteenth day of June 2005 before Vincent Connor, Notary Public, Glasgow compeared EDWARD MACIVER MACKECHNIE, Solicitor, MacKechnie & Associates, 27A Park Circus, Glasgow, G3 6AP who being solemnly sworn depones as follows:

1. My name is Edward MacIver MacKechnie. My address is c/o MacKechnie & Associates, 27A Park Circus, Glasgow, G3 6AP. I am 55 years of age. I qualified as a Scottish Solicitor in 1972 having completed the requisite period of professional training following my graduation (Bachelor of Laws) from the University of Glasgow in 1970. I have practised as a Solicitor in Scotland, doing exclusively Court work and Arbitrations, from 1972 until the present date. I am also a Notary Public and, since June 1993, I have also been an admitted Solicitor in England and Wales.

2. Between 1972 and 1975 I was employed as a Court Solicitor by a firm in Hamilton, Strathclyde and then by a larger firm (Bishop & Co) in Glasgow. In 1975 I became a Partner in Bishop & Co and effectively founded its Litigation Department. I led that Department from 1975 until 1986. In the period between 1972 and 1986 I acted in a wide variety of Court cases many of which were criminal. In 1986 I left Bishop & Co to become a Court Partner in probably Scotland's largest legal practice at that time (McGrigor Donald, now known as McGrigors). I was a Partner in that firm until I retired in December 2001. In early 2002 I formed MacKechnie & Associates. I am the sole Partner and employ now only three persons, two of whom are investigators. Also in 2002 I became a consultant to the firm of Masons (now Pinsent Masons) with offices throughout the United Kingdom and various localities worldwide.

3. In large measure, between 1986 and 1999 my work concerned complex building and civil engineering cases, mostly on the dispute resolution side. I also acted in a number of intellectual property matters of some size.

4. In about April or perhaps early May 1999 one of my Partners mentioned to me that he had heard, through his involvement with the Law Society of Scotland, that "Libya" was looking to appoint Solicitors

05\131663.1

to act for one of the two Libyans who had been indicted for the Lockerbie murders. While I had no recent criminal experience I was very interested in the possibility of becoming involved in what had been described as the largest and perhaps most important criminal Trial in UK history. My then firm (McGrigor Donald) was one of the largest in Scotland (but also with offices in London). We had the requisite resources to act in such a case. We also had experience in dealing with large, complex cases involving significant document handling and the use of computer technology. In brief, I came to be interviewed by Lawyers from London, Scotland (essentially the team already acting for <u>both</u> Libyans) and Libya and was appointed to act for Al Amin Khalifa Fhimah, subject to his approval. Mr Alastair Duff, Solicitor (now a Sheriff) continued to act for Abdelbaset Ali Mohamed Al Megrahi. In this way there came to be two separate legal teams acting for the two accused.

5. Mr Fhimah approved my appointment and preparations for Trial commenced. I selected and appointed my Team. Preparing for Trial was a massive undertaking given that there were listed about 1,300 witnesses (the list altered from time to time with additions and deletions) spread over many countries. We also had to examine and investigate many hundreds of productions (or exhibits). There were many potential defence witnesses, mostly abroad. It is sufficient to say that when the Trial commenced on 3 May 2000 probably neither the Crown (i.e the Prosecution) nor the Defence Teams could be said to be entirely ready but the understandable imperative given that the two accused had been one year in custody and 11 ½ years after the bombing was to commence what was a totally unique Trial in a specially constructed Court at Kamp Van Zeist, Netherlands.

6. As will be known, following the Trial Fhimah was acquitted and Megrahi was convicted. My involvement then ceased and I returned to my firm.

Megrahi appealed and was represented again by his original Defence Team led by Mr Duff. His Appeal failed. In about May 2002, I was asked to act for Megrahi. His Defence Team was discharged. I agreed to act and it was then that I formed MacKechnie & Associates. Obviously I obtained all files and papers from the previous agents. I assembled a small team (assisted by Pinsent Masons to whom I was a Consultant) and began the process of interviewing Megrahi and thoroughly investigating the case against him. This, for me, was a full time occupation. I employed investigators also on a full time basis. Two were former Police Officers. Given my previous knowledge of this case, the scale of the task confronting me was reduced. In September 2003, I lodged with the Scottish Criminal Cases Review Commission a 16 volume submission on behalf of Megrahi. The submission was to the effect that, in Megrahi's case, there had been a substantial miscarriage of justice, that Megrahi was innocent and that his conviction should be quashed. In the months following that original submission supplementary submissions were

*V.C.*

05\131663.1\FMM

lodged with the Commission dealing with new, compelling evidence. I refer to aspects of this hereinafter.

7. The Scottish Criminal Cases Review Commission was created by Section 194A of the Criminal Procedure (Scotland) Act 1995. The Commission has power to refer cases to the High Court for determination. If the Commission believes, after proper investigation (1) that a miscarriage of justice may have occurred, and (2) that it is in the interests of justice that a reference should be made, it may refer a case to the High Court. Once a case is referred, the High Court will determine the case as if it were a normal appeal.

8. The submission made by Megrahi to the Commission in September 2003 is without doubt the most substantial one ever received by the Commission. The official publication of the Commission [Exhibit "A"] even makes specific reference to the then increase in its budget to accommodate the costs associated with the case (at page 25). A further increase of substance was sought and approved by the Scottish Executive in 2005, specifically to cover further anticipated costs to be incurred in the review of the case. I believe their budget was doubled. I know that the Commission has three case officers, all of whom are qualified lawyers, working full time on this case to the exclusion of all others, supervised directly by the Chief Executive himself. This is unprecedented.

9. An entire floor of the Office block housing the Commission in Glasgow is devoted to the Megrahi case only. This too is unprecedented. I pay quite regular visits to these offices as I liaise with Commission staff on a range of developments and issues.

10. The Commission has made substantial progress with their investigations. They operate through legally qualified case officers who report through the Chief Executive to the Commission itself. They carry out strictly independent inquiries and have wide powers to obtain from the Crown Office (the prosecution), the Police and potential witnesses or possessors of data or information, such information as they believe is required to enable them to complete their investigations. They can exercise the power to precognosce witnesses under oath i.e. take in written form a formal statement from witnesses. Should they encounter difficulty in obtaining documents, productions, statements, records etc. from parties who are believed to possess these then they have the power to apply to the Court for an order that these are produced. This power has been used successfully by the Commission in at least one previous case in which the Crown Office had declined to produce all requested materials.

11. Unfortunately, the Commission cannot and will not comment publicly on cases which are subject to review. Thus it is not possible to seek from them a statement or declaration as to preliminary findings whether or not these should be favourable. I know they set budgets

V.C.

05\131663.1\FMM

and target dates by which stages of the investigation should be completed and I know they have made "substantial progress" as they have so advised me and my client. I refer to [Exhibit "B"] to this Affidavit which is the most recent letter sent to my client from the Commission. This is typical of the occasional reports provided. The prose is understandably guarded but it does indicate at least some specific areas of enquiry have been undertaken and either completed or nearly completed.

12. I cannot know when the Commission will issue its decision. I have been advised by the Commission that it will be before the end of 2005. I am hopeful that the decision will be issued by the end of October but I accept that I have no firm commitment from the Commission that this will be achievable. The Commission has, through its case officers, assured me that they seek to complete their investigations as early as possible. In the context of a case that regrettably goes back to 21 December 1988 the likely timing of the decision may not be thought to be unreasonably distant.

13. I also represent Fhimah who was acquitted by the unanimous decision of the Court. For reasons which I seek to explain hereafter, I believe that his position, while manifestly different from the convicted Megrahi, is nevertheless closely allied to that of Megrahi with whom the prosecution claimed he conspired to commit the crime. Thus I eschew comment upon the particulars of the supposed case against him save to say that there was no evidence at all that he was even in the vicinity of Luqa Airport, Malta when the alleged bomb suitcase was said to have been ingested. As discussed below it is a curious element of this case that the Crown (i.e. prosecution) case was that Fhimah was a vital and necessary facilitator at that Airport given his previous role as Station Manager for Libyan Arab Airlines. In other words, Megrahi was said by the Crown to have required Fhimah to assist him in some unspecified way to overcome an admittedly secure baggage system. The case was one of conspiracy. Yet the Court acquitted Fhimah. It then rejected the modus pressed by the Crown and substituted its own theory which, put shortly, was that by some unknown method or means Megrahi on his own was able to overcome airport security.

14. The case presented to the Scottish Criminal Cases Review Commission comprises a number of chapters. Revelation now of the details of the case would, in my estimation, potentially prejudice Megrahi's position. This is because I do not wish to give advance notice to the Crown, the Police or the intelligence agencies of the U.K. and the U.S.A. of the submissions made and, particularly, the submissions made concerning fresh evidence. I genuinely fear that, in this case, evidence that might have been available would be destroyed or concealed, that witnesses could be "encouraged" to alter their version of events or even be intimidated. Sources of our evidence would or could be revealed. I would be guilty of breaching confidences given to potential witnesses and to at least two important

V.C.
05\131663.1\FMM

sources. Some of these persons could not only be intimidated but prosecuted, fairly or otherwise, for revealing sensitive, privileged or even secret information. I state this in the knowledge it may appear extreme but my own, direct experience informs me that these risks regrettably do exist. I also would breach what I admit is a self imposed embargo of silence, given to the Commission at the time the Submission to the Commission was lodged. In effect, I undertook to the Commission that I would not reveal to any outside party what was contained in my own Submission. The principal reason for this was to avoid any possible speculation as to the provenance of occasional Press reports in the U.K. media. If a story appeared (as they have from time to time) I wished the Commission to be confident that it had not emanated from me or my firm. Given the importance of the matter before this Court I do not consider that this last consideration should by itself inhibit revelation of the case presented.

15. Subject to the hopefully legitimate concerns set out in the preceding paragraph, I seek to disclose some essential elements of the case submitted on behalf of Megrahi to the Commission:

   (a) The different cases against the Accused

   The terms of the original indictment were not, in a number of respects, sustained by the evidence led. The Crown in part recognised this and, in line with accepted procedure, sought to amend the indictment after evidence was led. The Crown submissions to the Court were thus based upon that amended indictment. [One of the more significant amendments was to delete the allegation that Fhimah was a member of the JSO i.e. the Libyan Intelligence Service. This could not be resisted given late evidence adduced from certain C.I.A. cables reluctantly produced after Court pressure which suggested that Fhimah was not believed to be a member of the JSO. Serious disclosure issues arise in this context. The Court in part rejected the Crown case. It acquitted Fhimah and effectively rejected the argument of facilitation by Fhimah referred to *supra*. The Court, in error, substituted its own theory of infiltration by Megrahi on his own without assistance by his co-accused. That was not the case Megrahi confronted and he had no notice of it. The supposed means of infiltration was never explained nor revealed by the Court. The Court made some amendments to the indictment when convicting Megrahi supposedly to reflect the view they had taken on the evidence. However, in error, the Court's opinion (which summarised the evidence upon which it relied) did not match the indictment as they amended it. To match the evidence believed, the indictment required to be substantially further amended. That indictment, with accurate amendments substituted, calls sharply into focus the sufficiency of evidence to convict.

V.C

05\131663.1\FMM

The "substitute" case of the Court is attacked as procedural unfairness and a breach of Human Rights.

The verdict is attacked as unreasonable given certain errors by the Court in approaching specific areas of evidence. The identification evidence is one only of a number of areas of attack. The important Maltese shopkeeper evidence is attacked. He was shown photographs of Megrahi, then made only a "resemblance" identification at an identity parade (line up) with no challenge to that "evidence" and then made another qualified dock identification. This is to be seen in the context of the clothes purchaser in Malta being described as 6 feet or more, under 60, 50 or more, heavily built as against Megrahi's slim 5 feet 8 inch frame and an admitted age in 1988 of only 36. The Court concedes this is "a problem" but nevertheless prays in aid a qualified identification.

The shopkeeper's Police Statements are very inconsistent and he is shown to have "identified" others including one who is described as the Clothes Buyer.

Evidence is challenged as selective and the onus of proof is said to be inverted.

The sufficiency of the evidence to justify conviction is challenged in a large number of respects.

(b)  **Defective Representation**

This covers the failure to adduce evidence as to the incrimination of others; failures to challenge the Crown case in a number of respects; a particular failure to cross examine the Maltese shopkeeper on numerous aspects; the identity parade and dock identification evidence; missing Police Statements; the wholly misconceived presentation of the Appeal and sundry other matters.

This is, in Scotland, a competent basis of appeal if one can show that, in the conduct of the defence, the original lawyer has failed to provide the standard of defence to which an accused should be properly entitled giving rise to a conviction that otherwise would probably not have occurred.

(c)  **Abuse of Process**

This is an area of significance and concerns interference in recovery of evidence at the crash site, the true provenance of the Police label relative to a crucial production ("timer fragment") and the clear suspicions concerning aspects of the forensic examination of this; the use of paid informers; the access by the Crown only to certain C.I.A. cables and the

V.C.

subsequent revelation that they exist; assertions falsely made that no disclosure was required as nothing of assistance to the Defence or likely to undermine the Crown's case arose. This is a major item of challenge.

(d) <u>Disclosure</u>

This is a very sensitive but important area and deals with the alleged failure to disclose information exculpatory of the accused or capable of undermining aspects of the Crown case. In part, it overlaps with (c) <i>supra</i>. Later I attempt to explain, without prejudicing Megrahi's position, why there is a reasonable basis for believing that the case against Megrahi was "engineered" i.e. that a circumstantial case was constructed and any elements of potential evidence that did not fit that construct, or which might call into question the reliability or weight of evidence to be presented to the Court, were concealed.

(e) <u>Errors in Appeal Court Opinion</u>

The potential grounds of appeal desiderated upon in the Submission to the Commission, fully supported by relevant legal authorities, were not argued before the Appeal Court. One of the fundamental errors said to have been made in the presentation of the Appeal was the express disavowal by Megrahi's Counsel of any argument based upon section 106(3)(b) of the Criminal Procedure (Scotland) Act (viz. Appeal Court Opinion at paragraph [5]). In short, section 106(3) provides that an appellant may bring under review of the High Court "any alleged miscarriage of justice, which may include such a miscarriage based on (a) subject to sub section (3A) to (3D) below, the existence and significance of evidence which was not heard at the original proceedings; and (b) the jury's having returned a verdict which no reasonable jury, properly directed, could have returned".

The approach adopted by Megrahi's Counsel in disavowing reliance on Section 106(3)(b) was in error. This is one of the principal grounds upon which the Appeal should have been argued.

Uniquely, in this Trial, there was no jury (a jury of 15 is the norm). So the Trial judges were the arbiters of both fact and law.

This unique Court was, by law, required to issue written reasons for its decision and it did so in the form of its Opinion. Thus, unusually, one does not need to infer what a jury may or may not have considered to have been proved beyond "reasonable doubt". The Court tells us. The Appeal Court

V.C.

05\131663.1\FMM

appears to have proceeded upon the basis that it could not challenge the inferences drawn by the Trial Court (acting as a jury) as to do so might amount to a substitution of its own view of the evidence before the Trial Court. This is said to go too far as it is open to the Appeal Court to assess whether the <u>known</u> inferences are reasonable and have a proper basis in the evidence. Equally, if the basis for rejecting a piece of evidence is mistaken, irrational or without proper foundation then the Appeal Court should "review" the reasoning of the Trial Court.

Professor Robert Black QC [Exhibit "C"] refers *inter alia* to the misconceived grounds of appeal in this case and the approach which, in his opinion, should be taken by the Appeal Court generally. I respectfully adopt his views in that connection but also his views concerning the sufficiency and quality of the evidence to convict.

(f)   New evidence

New evidence of a substantial kind has been discovered and details thereof have been provided to the Commission. As explained above, the Commission received the original 16 Volumes of the Submission in September 2003 and supplementary Submissions were then made dealing exclusively with matters of new evidence. Most of these supplementary Submissions were lengthy and very detailed. They required investigation. The Commission, with my agreement, stipulated a cut off date for any further Submissions (September 2004) so as to avoid a protracted review (or, as they then described it, "a moving target"). Investigation by me nevertheless continued but the product of that investigation does not form part of Megrahi's submission.

New evidence for me, is an area of extreme delicacy and, in being less than specific, I respectfully crave the Court's indulgence.

I seek to be careful in the words I use as I recognise that the allegations which follow, if found to be true, are deeply disturbing. I also respect the fact that, as yet, the Crown (as the potential contradictor in any Appeal hereafter) has had no opportunity of rebuttal.

In no order of importance I allege:

(1) That Police Statements of a crucial witness have not been disclosed. Their contents are unknown but, in terms of timing and context, it can be inferred they undermine the Crown case.

V.C.

05\131663.1\FMM

(2) That at least one Police Statement of a crucial witness has been altered, after the Statement was originally taken, to introduce false, incriminative material suggested by the Police.

(3) That a number of other Police Statements containing information helpful to the Defence or capable of undermining the Crown case have not been disclosed.

(4) That certain crucial items of "evidence" have been illegally introduced in order to establish connections in a purely circumstantial case which do not, in truth, exist.

(5) That supposedly contemporaneous forensic examination records are not, in fact, contemporaneous but have been added to or, in one instance at least, altered so as to fit the Police case (and subsequently the Prosecution case).

(6) That false testimony was given by a number of Prosecution witnesses (including Forensic scientists and two Police officers) without which no conviction would have been possible.

(7) That certain Police records have been altered or tampered with (even the Trial Court had one example of this and it related to the critical "timer fragment". The Court expressed concern but this, at the time, was an isolated incident. Without explaining why it so felt, the Trial Court professed itself satisfied that nothing "sinister" was involved. Now I believe it can be shown that it was sinister in the extreme).

(8) That "intelligence derived" information, capable of being used as evidence helpful to the defence and incriminatory of others believed to have perpetrated the crime, has been concealed. There is evidence to prove this now. The source requires to be protected.

(9) That improper, unusual "inducements" have been made to at least one crucial Prosecution witness.

(10) Generally, that the case against Megrahi in particular and indirectly his alleged co-conspirator has been fashioned or fabricated by the Police.

These serious allegations require to be proved. Subject to quite stringent rules there is, by law, scope for the Appeal Court to allow new evidence to be heard by it in any new Appeal Hearing. Essentially, the Appeal Court (assuming the Megrahi case is referred) has to be satisfied that there may exist significant evidence not heard at the original

V.C

05\131663.1\PMM

proceedings and that there is a reasonable explanation of why that evidence was not so heard. (Section 106(3) of the Criminal Procedure (Scotland) Act 1995). The Appeal Court will quash a conviction if it is satisfied that the original jury (in this case, of course, the Trial Judges), if it had heard the new evidence, would have been bound to acquit. Where the Court cannot be satisfied that the Jury would have been bound to acquit, it may nevertheless be satisfied that a miscarriage of justice has occurred. (This is canvassed conveniently in the Appeal Court's Opinion at page 120 et seq).

16. While I have had to be somewhat inhibited in what I can state concerning the details of new evidence supportive of Megrahi's possible Appeal, I feel I can legitimately draw to the attention of the Court some details of a very recent case in which one of the most important Crown witnesses figures. That witness is Mr Allen Feraday, a senior Forensic Scientist (now retired) with R.A.R.D.E. and joint author of the detailed Forensic Report relied upon by the Crown in the Lockerbie Trial.

At first blush, it may seem to be irrelevant to refer to complaints, concerns or criticisms of a witness in connection with his evidence in one or more separate cases. Notwithstanding this, I crave again the indulgence of the Court and seek the opportunity to explain why it might consider the information which follows when weighing up the competing arguments presented to it in the present case.

It cannot be denied that, in the Lockerbie Trial, the witness Feraday was a vital witness for the Crown and that his evidence was a very material ingredient of the Crown case for conviction. His expert evidence was accepted, without reservation, by the Court.

I contend that, if the information that follows had been known by the Defence and brought out in full by at least cross examination and possible direct evidence, the credibility, reliability and indeed the integrity of this principal witness would have been impugned.

The Commission has recently been advised of most of what follows and have treated this as an exception (not formally but by inference) to their "cut off" date. They do not yet know, but very soon will, of a material development in the case to which I seek to refer.

17. <u>The case of Hassan Talal Yousef Assali</u>

Assali, a U.K. citizen, was convicted on 24 May 1985 in St Albans Crown Court of making an explosive device contrary to Section 4 of the Explosives Substances Act 1883. He was sentenced to 9 years' imprisonment. He served that sentence but always protested his innocence.

In essence, he was convicted, because of the expert evidence given by Feraday of R.A.R.D.E. that certain timers manufactured by Assali were suitable for use only with Improvised Explosive Devices as employed by terrorist organisations. His expert evidence was unequivocal and brooked no other explanation.

Assali, assisted by lawyers and no less than three distinguished experts, applied to the Criminal Cases Review Commission in England.

The Commission referred Assali's case to the Court of Appeal in February 2003. I refer to their Statement of Reasons and relative correspondence and reports (together forming Exhibit "D" to this Affidavit).

The Commission considered there may have been a miscarriage of Justice and that it was in the interests of justice to refer his case so that a fresh Appeal could be heard. The referral relied upon the three experts' opinions which flatly contradicted the evidence of Feraday in a number of material and compelling respects.

For reasons which at present I do not understand it was only recently (in May 2005) that substantial progress was achieved in Assali's case before the Court of Appeal. The Court at a Directions Hearing *inter alia* ordered the Crown to state the stance they would adopt in relation to the grounds of appeal which relied upon the three expert opinions i.e. were they opposing the appeal and, if they were, what was their response? The Crown was ordered to provide their answer by 17.00 on 16 June 2005.

At approximately 16.55 hrs on 16 June 2005 the Crown Prosecution Service sent to Assali's solicitor the required Prosecution's Response. (Exhibit "E" to this Affidavit). It can be seen that the Crown now, having had details of Assali's grounds of appeal including his experts' Report for well over 2 years, has confirmed that they shall not oppose his Appeal.

I refer next to a faxed message received today by my office from Assali himself (Exhibit "F" to this Affidavit).

I include this document because of its passing reference to two other cases in which Feraday's evidence was rightly

called into question i.e. the cases of <u>Berry</u> and <u>McNamee</u>. In the former case (very similar to Assali's as Feraday was the principal Crown expert and he gave evidence that a particular timer had only a terrorist use). Feraday's evidence was criticised and rejected by the Court. Lord Chief Justice Taylor found the evidence of Feraday "extremely dogmatic" and "misleading in the very least".

Feraday also gave at least very misleading and at worst entirely dishonest evidence in the Gibraltar Shootings Inquiry. This concerned the unlawful killings of suspected I.R.A. terrorists by the British SAS.

In support of what I state, I refer to Reports on the Berry, McNamee, Gibraltar Shootings and Assali cases prepared on my behalf (<u>Exhibit "G"</u> to this Affidavit). The Assali Report was obviously prepared earlier, prior to recent developments.

The situation is that a senior and absolutely vital Crown witness in the Lockerbie Trial had a "track record" of giving expert evidence (even in one case, the Gibraltar shootings, in which he was not truly an expert in the relevant field) which has later been rejected by other experts whose testimony has been accepted by the Courts.

I concede, as I must, that the fact that Feraday has given at least disproved testimony in no less than four other cases does not establish that any or all of his testimony in the Lockerbie Trial is equally false or deliberately misleading. I believe his evidence at the Lockerbie Trial was, in parts, false but I am not in a position to yet safely reveal why I believe that to be so. I do however, respectfully advert to the evidence of a "track record" in order to bolster what is, at this time, merely a general allegation of impropriety in the present case. I hope it is also reasonable to contend that the information herein imparted concerning Feraday's tarnished evidence and reputation would, if revealed to the Lockerbie "jury" of three Judges, have called into question the reliability and credibility of his equally dogmatic evidence in the Lockerbie Trial.

18. <u>Motion for Summary Judgement based on Collateral Estoppel</u>

I am not familiar with relevant U.S. law and have no locus to comment upon the competing arguments.

On behalf of Megrahi and Fhimah I express the hope that the Court may be prepared to suspend the granting of this Motion pending the decision of the Scottish Criminal Cases Review Commission. That suspension, if that be appropriate terminology, would not be lengthy. This case has had a long



V.C.

05\131663.1\FMM

history but if, as I believe, Megrahi and Fhimah are innocent they have been the victims of an abhorrent conspiracy to convict and of one of the worst miscarriages of justice of which I have knowledge. If the Motion should be granted then the prejudice to my clients is perhaps self evident. The case for Megrahi (and less directly Fhimah) is not that, for technical, legal reasons he should have his conviction quashed but rather that he is entirely innocent. This is not an issue about differing standards of proof in civil and criminal cases. Megrahi (and Fhimah) seek only the opportunity to establish the truth and their innocence. I do not know by what means, if any, a judgement entered now in U.S. civil proceedings could later be reversed following a favourable outcome of Megrahi's case. I can only assume that, at the least, considerable difficulties would arise. Neither Megrahi nor Fhimah have any material assets (as far as I know) but, in theory, they could be financially ruined. If the Commission, as I expect, refer Megrahi's case it must give its reasons for doing so. Those reasons alone might cause the Plaintiffs to abandon or re-direct their proceedings. Judgement issued now would receive publicity that certainly would not assist my clients' position. This is a very notorious case and, at least in the U.K., public interest and support can assist. There is already considerable disquiet in the U.K. and further afield concerning the Megrahi conviction. Professor Black's Article, forming <u>Exhibit "C"</u>, is but an example. Even an opposed finding against my clients could be misinterpreted and could discourage valuable support at a time when there is a groundswell of public opinion which, on balance, is favourable to the clients. Even the Chairman of the U.K. relatives of Lockerbie victims, Dr Jim Swire, believes Megrahi is innocent and has been quoted in the media to that effect.

The central issue might, in this case, be time. A decision by the Commission is now so close. I express the hope that, in the balance, it might be thought just to delay consideration of the Motion for a period which to the Court will seem reasonable in order that the interests of justice might best be served.

ALL OF WHICH IS THE TRUTH AS THE DEPONENT SHALL ANSWER TO GOD

..................................................   ..................................................
Edward MacIver MacKechnie                Vincent Connor, Notary Public

05\131663.1\FMM